## HINDS *v.* HINDS.

The terms "resides" and "resident" in chapter 86 of the Code, mean a legal residence—not an *actual* residing alone—but such a residence as that when a man leaves it temporarily or on business, he has an intention of returning to, and which, when he has returned to, becomes, and is, *de facto* and *de jure*, his domicil.

Before the applicant for a divorce can claim to be within the jurisdiction of our courts, such applicant must have a fixed habitation, with no present intention of removing therefrom.

*Appeal from the Lee District Court.*

ON the 18th of October, 1854, the complainant, Catharine A. Hinds, filed her petition in the District Court of Lee county, for a divorce and alimony, under the eighth clause of section 1482 of the Code, which authorizes a divorce when it is "made fully apparent that the parties cannot live in peace and happiness together, and that their welfare requires a separation." The petition avers, also, that the complainant was, at the time of filing the same, and had been for six months before, a resident of said Lee county. The answer of the respondent denies each and all the matters contained in the bill, and the residence of complainant is expressly negatived. It also avers that complainant is, in truth, a resident of Hannibal, Missouri, and not of Keokuk, Iowa; that she came to Iowa to procure a divorce, and for no other purpose; that she has no intention to make this state her home; but that she expects to reside with her uncle, who is a resident of Hannibal, Missouri. The testimony is all contained in depositions taken by the parties, is very voluminous, and the parts material to the decision will appear from the opinion of the court. The District Court granted a divorce, and the respondent appeals.

*J. W. Rankin,* for appellant, cited the following authorities: As to the meaning of the word residence, *Williamson* v. *Parisien,* 1 Johns. Ch. 389; *Jackson* v. *Jackson,* 1 Johns. 424; *Smith* v. *Smith,* Iowa Sup. Court; 12 Mass. 202; 12

N. Hamp. 202 ; *Scott* v. *Scott,* 6 Ohio.    That the husband is not divorced by the decision of the court.    Story's Conflict of Laws, §§ 228, 229, 230, and note at bottom of page 346. As to proper cause for wife leaving husband, 2 Equity Dig. 41.

*Samuel F. Miller,* for appellee, contended that the respondent, by appearing and defending the suit, had given the court below jurisdiction of his person, and that the residence required by the statute to authorize the commencement of proceedings for a divorce, was not a permanent one.    There need be no intention to remain.    In support of these positions he cited Story's Conflict of Laws, §§ 217, 218, 41, 44, 45, 46 ; 9 Iredell, 101, 106 ; Code, 546.

WRIGHT, C. J.—It appears that these parties were married on the 2d of November, 1846, in the state of Massachusetts. They continued to live together, with the exception of a short separation in the year 1848, until in September, 1850. At that time, from some cause, perhaps not very clearly developed, they separated.    The complainant remained with some friends in Boston until the next spring, when she came to Lockport in Illinois, to reside with her uncle, one Edward B. Talcott.    The respondent remained in Boston. Since that time, complainant has been in Boston once, if not oftener, but their separation has been complete since the autumn of 1850.    In March, 1854, she came to Keokuk in this state.    In December, 1854, her uncle removed from Lockport, Illinois, to Hannibal, Missouri.    Up to the time of filing the petition, she had remained in Keokuk, except perhaps two visits to her uncle, while he was at Lockport.

This case has been most fully and ably argued by counsel, showing the deep solicitude of themselves, as well as their clients, in the result.    The parties, from all the testimony, appear to be very intelligent, to have enjoyed the society of the best circles in the city of Boston, and to have had the esteem and confidence of the learned and worthy wherever known.    Their position and influence have natu-

rally drawn around them, and to the support of each, in this unpleasant controversy, a strong array of warm and ardent friends—friends of intelligence and influence. From the deep solicitude manifested, as well as the zeal, ability and confidence exhibited in the argument, we have given the case careful consideration, and arrived at a conclusion that to us, at least, is satisfactory.

It is claimed by the respondent that no divorce can be granted in this case : *First*, because complainant was not a resident of this state for six months next preceding the filing of her petition, within the meaning of the law; and *second*, if she was, then the testimony does not make it " clearly apparent to the court that the parties cannot live in peace and happiness, and that their welfare requires their separation," or that the equity of the case is with the respondent, and not the complainant.

The first question is jurisdictional in its character, and will be first examined. The provisions of our Code, on the subject of residence in these cases, are as follows : Sections 1480 and 1488 provide that " The District Court in the county where the plaintiff resides, has jurisdiction of all cases of divorce and alimony and of guardianship connected therewith." " The petition for divorce, in addition to the facts on account of which the plaintiff claims the relief sought, must state that he (or she) has been for the last six months a resident of the state. It must also be sworn to by plaintiff."

On the part of the complainant it is claimed that the words " resident " and " reside," as used in the law, do not have the same meaning as the word domicil; that the question of intention cannot be considered in determining such residence, whether with reference to the coming into the state or that of remaining. It is urged with much ability that the legislature, by making the remaining within the state a required, definite time, to wit, six months, designed to make such time the evidence of intention, without reference to the motive of the inhabitancy, or the future design of the party. And it is further claimed that even if this is

not the law, then the testimony shows that complainant is a *resident* within the strictest construction of the term, and had been for six months before the filing of her bill.

We cannot concur entirely in the first part of this proposition. The residence contemplated by our law, in these cases, cannot, in our opinion, be that of the sojourner—the visitor—that of one here on business, or for the accomplishing of a particular purpose—with no intention of remaining. The *animus manendi* must exist, in order to constitute a residence. Not that, in the language of Vattel, " it shall be a habitation fixed, with the intention of always remaining," but rather that there shall be a fixed habitation or residence, without any present intention of removing therefrom.

Our law provides that " words and phrases shall be construed according to the context and the approved usage of the language; but technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in law, shall be construed according to such peculiar and appropriate meaning." Code, section 26, clause 2.

In giving a construction in this instance, but little aid can be obtained from the language used in the context. So far as the object and purposes of the law are concerned, however, as developed in this chapter, some assistance is given. The residence in the county gives jurisdiction, not only as to the divorce, but also as to alimony; and not only as to alimony, but also of " guardianship connected therewith." Was it the design of the law that a sojourner—a temporary dweller for the space of six months, averring an intention to leave as soon as he obtained his divorce—was to be entitled to the aid of the law, not only to be divorced, but also to have the question of alimony, and the guardianship of children, settled at the same time? We do not believe so. There is more reason in saying that it was designed to operate upon residents permanent, and such as that their character, property and condition in life, had become known and understood, and who, from actual inhabitancy, were entitled to the aid of our laws.

But why provide for six months, or any time, if there

was nothing like permanency contemplated? If the mere sojourner or visitor, for six months, is a resident within the meaning of this law, why not the sojourner of a day or a week? The length of time that such persons may remain, if the *animus manendi* does not exist, cannot increase or make more perfect their inhabitancy or residence. It was thought best that some time should be mentioned. Under the laws of 1839, one year's residence was required. The statutes of 1843 provided for the same time as in the Code. If the residence was not designed to be in good faith, then we can see no reason why a sojourner should go through the penance of staying within the state one year or six months, when, at the expiration of those times, he would no more have a domicil—become an inhabitant or resident— than on the first hour of his arrival.

But further, in considering the context, let us look at the eighth cause for a divorce under the Code, and the one relied upon in this case. It must be " fully apparent to the court that the parties cannot live in peace and happiness," &c. The court, as we apprehend, is not to be satisfied that in years and months past the parties could not live together in peace and happiness. The whole past may have been condoned and buried. It has reference to their ability to so live at the time of making the application, in determining which much aid might be gathered, it is true, from their previous conduct and happiness. But if the husband can leave the wife, or the wife the husband, and come to our state, board at hotels, and visit any and everywhere within and without the state, and no reliable means are afforded for showing the true character of the applicant, as you could in the case of the *bona fide* resident, how could it ever be said that the parties could not, at the time, live in peace and happiness together. Difficulty, it is true, might exist in making the proof, and ascertaining the reliable facts, in cases where the applicant had his residence *bona fide* and actual for only six months. But, we apprehend, not so much so as in the case supposed. The *bona fide* resident designs and expects to continue his home where he brings

his suit.   The one who has a residence temporary and fugitive in its character, however, leaves so soon as divorced, careless of any fraud he may have perpetrated, or any imposition practiced.

But, not to further enlarge here, let us next ascertain what "the approved usage of the language" would dictate in giving this construction.   And here we may remark, that such is the character of our language that nearly, and indeed most of the words in general use, will be found to vary in meaning, according to the context or connection in which they are used.   This might be illustrated by a very large reference.   Take the words "settlement," "sentiment," "right," "apparent," "reasonable," "loud," "levity," and "restraint," as an illustration.   Many of these words we have selected at random from the chapter regulating divorce and alimony ; and the curious, by giving these words their frequent conceded meaning, without reference to the connection, will readily see the change or jargon that would be made in this chapter.   So it is with the word reside or resident, in speaking of its construction from the approved usage of the language.   Webster's definition is, "to dwell permanently, or for a length of time;  to have a settled abode for a time.   When the word is applied to the natives of a state, or others who reside in it as permanent citizens, we use it only with reference to the part of a city or country in which a man dwells.   One who resides or dwells in a place for some time.   A man lodges, stays, remains, abides, for a day or a very short time, but *reside* implies a longer time, though not definite.   To set, to settle."   It will be observed that the learned lexicographer uses the word "dwell" in this definition.   The definition of that is, "to abide as a permanent resident," "or to inhabit for a time;" "to live in a place."   Dwell may signify a residence for life.   And in this definition he uses the words "inhabit" and "live."   To inhabit is to occupy as a place of settled residence; to live is "to abide, to dwell, to have a settled residence in any place."   So that, while no definite time is necessarily implied from the word *resident* or *reside*,

yet permanency is implied, and expressly used in giving the definition. But take the usage of the word. When we say a man resides in Iowa, do we mean he is on a visit or a business trip? When we speak of A.'s being a resident of New York, do we mean he has gone on a pleasure excursion or to attend to a law-suit? If you meet a stranger in our streets, who has been within our state for a year on business, and ask him his residence, he will say " I reside in New York (or Boston), but I am at present remaining, staying or sojourning in your state." He would never think of saying, "I reside in Iowa." And the truth is, that these words have a signification when applied to the citizen, inhabitant or dweller in a state, that is clear, definite, and well understood ; and approved usage clearly attaches to it more than a mere remaining, sojourning or abiding, without a view to permanency or citizenship. We never approve of its use if applied to a person who has no intention to remain in our state, or an affirmative intention of leaving when a particular object is accomplished, or when his business is concluded.

Let us now see whether these words have, or have not, a peculiar and appropriate meaning in law. This, we must determine by reference to the text books, the construction given to them by courts, and the connection in which they are generally used.

Bouvier defines the word resident, as follows: "A person coming into a place, with an intention to establish his domicil or permanent residence, and who in consequence actually remains there. Time is not so essential as the intent." 2 Law Dict. 468 ; Domat. Lib. 2, 485. "Art. 4. The principal domicil of every one is that which he makes the seat and centre of his affairs, and which he does not leave but on some particular occasion, from whence, when absent, he is said to be from home, or when he returns to, he is said to have come home." "Art. 5. Since the domicil is the place of one's residence, it is all one as to the domicil of a person, whether he reside or dwell in his own house, or in that of another, which he leases, or possesses by some other title.

And for the same reason, that it is the residence which makes the domicil; he who has a house of his own in a place where he does not reside, has not, for all that, his domicil there." By the common and canon law, the word residence was peculiarly used in relation to the benefice of the parson and vicar, and his continuance therein. For reading of prayers and preaching, as also for purposes of hospitality, and to maintain the house or cure in repair, he was required to be present, to abide or dwell there; and the word *resident* is used to show or express this character of permanency or living. 1 Blackstone, 392.

It will be found by Kent, 76, that the learned author uses the words domicil and residence, in the same connection, not perhaps entirely in the same sense, but speaks of the *animus manendi*, as essential to the establishment of a resident, national character.

In the case of *Crawford* v. *Wilson*, 4 Barbour, 520, Paige, J., refers to the fact that in *Frost* v. *Brisbin*, 19 Wend. 11, a distinction had been recognized between domicil and residence. He also refers to Vattel's definition of domicil. It is also stated that, "the residence of a foreign minister at the court to which he is accredited, is only a temporary residence. He is not then *animus manendi*. The same may be said of the officers, soldiers and seamen in the army and navy. They may be said to have their domicil in one place, and their residence in another. But, generally, residence and domicil, mean the same thing. The place where a man carries on his established business, and has his permanent residence, is his domicil. Inhabitance and residence are generally used as synonymous terms. Inhabitancy and residence do not mean precisely the same thing as domicil, when the latter term is applied to successions to personal estate, but they mean a fixed and permanent abode or dwelling place for the time being, as contradistinguished from a more temporary locality of existence." *Matter of Wrigley*, 8 Wend. 140.

It was held in the *Matter of Fitzgerald*, 2 Caines, 318, that a resident within the state, was one who had a residence of

a permanent and fixed character, not one who had a mere esidence of a temporary nature. In *Thorndike* v. *City of Boston*, 1 Metc. 245, SHAW, C. J., says: "The questions of residence, inhabitancy, or domicil, although not in all respects precisely the same, are nearly so, and depend much on the same evidence." In *Cadwallader* v. *Howell*, 3 Harrison, 144, DAYTON, J., says: "The expression, 'fixed residence,' is generally used as tantamount to domicil, though I am not prepared to say whether they are or are not, in all respects convertible terms." In *Roosevelt* v. *Kellogg*, 20 Johns. 210, WOODWORTH, J., says: "A person resident, is defined to be one dwelling or having his abode in any place, an inhabitant, one that resides in a place," and it was there held, that inhabitant and resident signified the same thing. It is true, that in the subsequent case of *Frost* v. *Brisline*, 19 Wend. 11, these definitions were doubted by C. J. NELSON; but while this doubt is expressed, it is there held, "that a transient visit does not make the resident; that there must be a settled, fixed abode; an intention to remain permanently." In *Spragins* v. *Houghton*, 2 Scam. 377, it is held, that: "There is no ambiguity in the word *resident*. Every man is a resident, who has taken up his permanent abode in the state." This case was very fully argued by able counsel, and the whole subject of the meaning of the words citizen, inhabitant, and resident, is very fully reviewed. It is there very clearly recognized, that the term inhabitant, refers to the place of a person's residence, and excludes the idea of an occasional or temporary residence, but contemplates that which is *bona fide*.

The constitution of Kentucky in 1833, required residence in the state, and actual residence in the county, for a certain time, as qualifications for electors. In the celebrated contested election case of *Letcher* v. *Moore*, in Congress, it was held that the terms there used meant the same as that given to the word "home" in the vernacular tongue, and the term domicil by the writers on the civil law. But let us look further into the use of these words and their connection in the constitutions and statutes of different states. In Maine,

in their constitution and laws, published in 1819, in defining the qualification of representatives, and in giving jurisdiction in cases of divorce, the words *live* and *reside* are used. Kentucky, in her new constitution, in speaking of the qualification of electors and representatives, uses the word *reside*. So it is by the new constitution of Indiana. Michigan, in the published laws of 1846, uses the word *reside*, in speaking of voters, and also of jurisdiction in divorce cases. So does Missouri, in the laws of 1845, on the subject of divorce. We have not examined the statutes of other states. But in those above referred to, can it be pretended that a temporary, casual, or fugitive residence was meant, and not a permanent one? We apprehend not. And no case can be found, under these constitutions and laws, that recognizes any such construction. Their framers were aware of the fixed, settled, and well understood meaning of those terms, and hence their use. And here, we would remark, that it is seldom, if ever, that we find the word domicil used, in providing for the inhabitancy or residence of the citizen, in our constitutions and statutes. It may be found in the Civil Code of Louisiana, and a few other statutes following, to some extent, the rules of the civil law, but it is unusual; and we regard it as a legitimate deduction therefrom, that the words resident, reside and inhabitant, which are most generally used, have a legal meaning in such connection; and that the intention of remaining permanently is an element in determining the same—that they include the idea of permanence. Otherwise, we must presume that it was no part of the object of the law maker that permanency, or the intention to abide and remain, should be an element in such residence. This we cannot do.

It is true, that the question of intention may at times be obscure and difficult of ascertainment. And the same may be said with reference to the word domicil, in the settling of which, it is conceded in the argument here, we must look to the intention. The same difficulty arises with regard to many things depending on intention under the law; and yet, that intention has to be ascertained from the best lights

presented in each particular case. On this question, as in others, certain acts or circumstances afford presumptive evidence of the intention, and, until rebutted, will be conclusive, while other cases may arise, where such intention must be deduced from a great variety of minor circumstances. So that this is, in truth, an argument that is addressed more against the policy of the law and the difficulty of its administration, than as tending to militate against the construction here given.

It is doubtless true, that authorities will be found not concurring in detail with those above cited. Indeed, what is and is not a residence, for various purposes, has been a subject of much controversy. We are not aware, however, of any authority that holds that a mere transient, temporary sojourn, with no intention to remain permanently, can constitute a legal residence.

As not maintaining the positions above stated, we are referred by complainant's counsel to Story's Conflict of Laws, section 44: "Two things," says the author, "must concur to constitute domicil; first, a residence; and secondly, the intention of making it the home of the party. There must be the fact and the intent." We are not able to see that the same author gives any definition to the term resident or residence. The word domicil, we may also suggest, is that used by the old law writers, and even modern text books, as conveying, according to law language, more fully the whole meaning arrived at. And yet, as here used and defined, it does not seem to us, that the author can be understood as saying that residence, or the term resident, means a dwelling, an abiding without reference to intention or permanence. True it is, there must be the fact of the intent. Now, what fact? We answer, the act of abiding; the fact of a dwelling; a habitation; and having this residence—having an abode—this abode, this dwelling, then, if the intent exists, the domicil is perfect. In other words, the mere intent, without the fact of residence or abiding, cannot constitute the domicil. Neither can the intent, without having the abode, the home, the place to dwell, constitute the residence.

Residence, as there used, we think, has reference to the fact that the citizen or person has a place that, to use an expressive word, is called *home*, with no present intention of removing therefrom.  Not that the person is to remain continuously there, in order to retain his residence or domicil, but if absent, for a long or short time, with the *animus revertendi*, the domicil still continues.

The case of *House* v. *House*, 9 Iredell, 99, asserts the same doctrine, as above quoted from Judge Story, and indeed so much of it as relates to this question, will be found to be copied from that work.  The judge, however, in that case, says that " domicil, in its ordinary and familiar use, means the place where a person lives or has his home ; while, in a large sense, it is where he has his true, fixed and permanent home, to which, when absent from it, he intends to return, and from which he has no present purpose to remove."  In other words, he recognizes an ordinary and familiar use of the word domicil, and also its use in an enlarged sense ; and lays it down, that the fact of residence must exist, and also an intention.  It would be as hard to conceive a residence without a place or locality to abide, dwell, or live, as it would to conceive of a domicil without the same.  And that, in our opinion, is what is meant; and that it is not intended that a man may have a residence, in legal acceptation, without reference to intention, any more than he can have a domicil.

We are also referred by counsel for complainant, to art. 2, sections 1 and 4; art. 3, section 4, of our state constitution, and section 259 of the Code.  These sections define the qualifications of voters, and eligibility of members of either house of the General Assembly.  We have carefully examined those sections, and are unable to see in what way they can assist in the construction claimed by complainant.  It is said that in these sections the word "citizen," as well as the word "resident," is used, and that the design was to qualify thereby the character of the residence.  We do not conceive that such was the design in using the word citizen.  The term citizen has reference to a person, native or

naturalized, who has, other qualifications existing, the privilege of exercising the elective franchise. And hence, in the case of *Spragins* v. *Houghton*, above cited, it was held, that as by the constitution of Illinois, they had only used the word inhabitant, that if the person permanently dwelt, or resided there the required time, he was entitled to vote, notwithstanding he was not a naturalized citizen. It was to avoid this that citizenship, as well as residence, were made requisites in their state. So, by the 4th section, art. 2, relating to persons in the military or naval service of the United States, we think there is nothing to aid the construction claimed. If we were to lay out of view entirely, that this provision was designed to prevent our elections, in any contingency, being controlled by the action of the central government, we might, with much propriety, draw the argument, that if residence without intention governed in this question, then there is no reason why these soldiers should not vote. They are, in truth, residents according to the construction contended for; but, for the reason above suggested, and because there can be nothing like a permanent intention, they are expressly held not to be residents within the meaning of the law.

It will be observed that the same words are used in those sections as will be found in the constitution and laws of many of the states on this subject, and the same as in our Code regulating divorce. And yet, would any person claim that a mere transient sojourner within our state, with no intention of remaining, was a resident within the meaning of these provisions, and entitled to the elective franchise? Or, is it true that a citizen of the United States is to vote, if he happens to have his person within our state for six months, but with no intention of being a resident; and the actual *bona fide* resident is to be deprived of such right, if he is gone for one, two or three years, with an intention to return, and who does return, on the very day of an election? We cannot believe that in any section where the words residence or resident is used, it was designed to so utterly ignore the question of intention.

Hinds v. Hinds.

We have thus, somewhat fully, examined this point in the case. And but for the confidence with which it was urged, we should have been content with simply referring to the ruling made by this court in the case of *Smith* v. *Smith*, at the June term, 1854. We would not say, that the facts in that case are similar to those in this. We are free to admit there is a marked difference, but a construction was there given to the meaning of these words, in which we concur, and which is the same as above stated. The rule laid down in this respect in that case, has been most fearlessly and ingeniously questioned by counsel, but we see no reason to disturb it. And we therefore conclude, that by the context, the usage of our language, and the legal meaning, it is designed that before the applicant for a divorce can claim to be within the jurisdiction of our courts, he must have a fixed habitation, with no present intention of removing therefrom. We think that this is the clear meaning and letter of the law. Did it bear the other construction, we should unhesitatingly so hold, leaving the consequences to legislative action. We think it means a legal residence, not an actual residing alone, but such a residence, as that when a man leaves it temporarily, or on business, he has an intention of returning to, and which, when he has returned to, becomes, and is, *de facto* and *de jure*, his domicil, his residence.

Before going to the other branch of the case, we would notice a further point made by complainant's counsel. And that is, suppose complainant should remain in Iowa until her death, and a question should arise, as to when residence commenced, would it be from March, 1854, or when? This is an argument, to our minds, ingenious rather than sound, or applicable to the question at bar. It is not sufficient to say, perhaps, in the language of Judge Story, that "an intention of permanent residence may often be engrafted upon an inhabitancy, originally taken for a special or fugitive purpose." The question has also been asked, where is this complainant's residence, if not here? It is, perhaps, sufficient to say, that if it is not here, then it is

immaterial where it may be, whether in Massachusetts, Illinois, or Missouri. By the law, the residence of the husband is that of the wife, unless they occupy such an antagonistic position that such relations cease. And whether the wife can acquire an independent residence by commencing a suit for divorce, may or may not depend upon the further fact, whether she has equity in her prosecution, or whether, in fact, she is the innocent and injured party; and this would involve the consideration and examination of the whole testimony in each case.

But let us now examine the testimony bearing on the question of residence, so as to see whether the complainant is a resident within the meaning of the law as above construed. The complainant's testimony is as follows: *Sarah H. Stover* states, in February, 1855, that complainant came to Keokuk, in March or April, 1854, and that she has resided there since; that she was absent about three weeks, visiting her aunt in Lockport, Illinois, being detained by reason of her aunt's sickness, and also twice to Missouri, being gone some two or three weeks each time; that she boarded, while in Keokuk, one week at the Laclede Hotel; then at the St. Charles; then at Mr. Tucker's; then at Mr. Davis's; then at Mr. William's; and then at Mr. Brownell's; and that she had no knowledge of complainant's having relations in Keokuk or Iowa, and yet she might have. *Eliza Williamson* testifies to about the same as to residence; but does not speak of complainant's absence or anything as to relations. It is also shown by a written agreement on file, that about the time complainant left her boarding at Tucker's and Davis's, those persons changed their residences, one moving to Illinois, and the other into a different part of the city of Keokuk. *Edw. B. Talcott*, of Hannibal, Missouri, in February, 1855, states, that complainant left his house, where she had been residing since the spring of 1851, on the 20th of March, 1854; that he then lived in Lockport, Illinois; that she went to Keokuk, Iowa; that he moved to Hannibal, Mo., December 1st, 1854; that plaintiff at that time came to Hannibal on a

visit, and was detained some two weeks longer than she expected, by sickness; that she started back to Keokuk on the 5th January, 1855; that she is a niece of his wife; and that the parties have been separated since 10th September, 1850. This testimony also shows that he and the complainant are on very friendly terms; and the testimony of others develop the facts, that he feels a deep solicitude, even paternal in its character, in the result of the controversy, and that he has acted the part of a warm and zealous friend in her behalf.

The respondent proves as follows: *M. E. Poole* testifies, that complainant visited Boston in the winter of 1853 and 1854, and she then told her, she was living with her uncle Talcott, at Lockport, Ill., and that he had promised her a home as long as she lived; that she should not return to Boston again until she was free; and that her uncle was going to try to get her a divorce; that she left Boston, 1st January, 1854, to reside with her uncle Talcott. *Mrs. Button* states, that in January, 1854, complainant told her that she was living with her uncle Talcott; that he was kind to her, and that she traveled with him for company, as her aunt was in delicate health, and could not go. *Dr. Cleveland* states, that in January, 1854, complainant told him in Boston she was going back with her uncle (who was then with her) to Lockport; that soon after ariving home, she expected to go to Iowa, to spend some six months or more, as her uncle said it was necessary in order to obtain a divorce; that she intended to reside with her uncle; that her home was there, and that he was very kind to her. Also, that the uncle told him at the same time, that he had taken some steps towards procuring a divorce for complainant; that she was going to Iowa to spend a certain time there, as the law of that state required for that purpose; and that in Iowa much less was required to obtain a divorce than in other states; that he had taken care of her and would continue to do so. *E. P. Ward* testifies, that he is cousin to complainant; that she left Boston in the spring of 1851, to reside with her uncle Talcott; that she and her uncle had

been in Boston twice after she had left her husband; that in July, 1854, he had received a letter from complainant, a copy of which is attached to his deposition. The letter was written at Lockport, Illinois, and dated June 30th, 1854, and uses this language: "Uncle will probably move his home to Missouri in the early autumn, and I assure you I shall go with no other regrets than those of leaving behind the many dear friends I have been blessed with, during my sojourn in Illinois. I shall find a milder climate, one I think more congenial to my taste, and more conducive to good health. . . Our good family are feasting on strawberries, and have been since the 10th of this month." In May, 1853, she also wrote to witness, designating her uncle's house as her home. Talcott, also, adds a postcript to the same letter, in which he refers to some talk he and the witness had had about the divorce, telling him to make no further efforts in that way, for he had a better prospect in view, but what it was is not developed.

This is the substance of the testimony on this point, as we have collected it from over two hundred pages of depositions. This testimony does not satisfy us that complainant had been a resident six months next before the filing of the bill, as contemplated by the law. The residence is directly put in issue by the pleadings, and unless the testimony does so satisfy us, we regard it as our duty to dismiss the bill. All proper consideration has been given to the fact, that the court below ruled otherwise: but in these causes, where the whole case comes up and is heard *de novo*, the presumption that obtains, where the hearing is on error, does not continue. Our reasons for the conclusion at which we have arrived, are briefly these:

1st. The complainant's testimony, to give it the strongest weight, shows that she had been in Keokuk (without reference to the time she was at Lockport, Illinois) only a little over six months, engaged in no particular avocation, not visiting or living with relations, and no reason shown why she had left her uncle, and come to Iowa among strangers.

2d. The testimony of Cleveland, Ward and others, shows

conclusively, that her home was with her uncle, and no one reason, disconnected from the obtaining a divorce, is shown for seeking a home in Iowa.

3d. She and her uncle stated, that she was coming to Iowa to obtain a divorce, for that purpose alone, and that she was then to return to her home with her uncle.

4th. In June, 1854, after she had come to Keokuk, and when it is said she was on 'a visit at Lockport, she writes her cousin, of her uncle's intended removal, of her intention to go with him, and of her anxiety to get into a warmer and milder climate.

5th. Instead of showing an intention to remain, or no present intention to remove, it shows affirmatively, that she does not regard this as her home, and never has at any time, but, on the contrary, considers and treats her uncle's residence as her home and her residence.

This view renders an examination of the other part of the case unnecessary. Satisfied as we are, that complainant had not a legal residence, as contemplated by the law, at the time this suit was commenced, without expressing any opinion as to the merits of this unhappy difficulty, we concur in the opinion, that the decree rendered in the court below must be reversed, and bill dismissed without prejudice.