FRED H. WARREN v. THE BOARD OF REGISTRATION.

*Elections—Qualifications of voters—Residence—Citizen having lodging in one ward and boarding place in another.*

1. Where the only question of the residence of a voter for purposes of election is whether his lodging room or his boarding place governs, he should be registered where he boards.

2. The following propositions are summarized from the opinion of Mr. Justice CAMPBELL:

   *a*—There can never, in the eye of the law, be more than one domicile of citizenship; and that continues, in the case of a citizen, till he himself renounces it absolutely, and takes up another in its stead; and such a domicile is not lost by absence in the State or out of the State, whether within or without the United States. *Harbaugh v. Cicott*, 33 Mich. 242.

   *b*—Mere bodily presence or absence can have no effect in determining residence, when once existing.

   *c*—Temporary abode in a city or ward does not make a person an elector. Unless the person coming in does so with the honest and settled intention of obtaining a new domicile, he gains no rights.

   *d*—It is always to be remembered that a citizen who has elected his domicile is entitled to enjoy it. The only question is as to the particular action which indicates his choice.

   *e*—The family or household, whether composed only of relations, or including, as it commonly does in law, all the members of the household, is the natural group of fellow-residents.

*f*—Where long and inveterate usage has existed for half a century unchanged, it is of itself, unless repugnant to some principle, of great force as a public custom.

*g*—It must be remembered that the right of voting is one which cannot be taken away by direct law or impossible conditions.

*h*—The primary rule of elections must always be to save the voter his rights.

*i*—No one who is not a *bona fide* resident can eat himself into the quality of a voter. The period of residence required means actual and permanent sole residence, and not a few days' commorancy for the purposes of one election. A temporary resort to a precinct for no other honest purpose of residence is a fraud, and no residence, and gives no rights.

*Mandamus.*    Submitted October 24, 1888.    Granted October 25, 1888.    Opinion filed November 1, 1888.

Relator applies for *mandamus* to compel respondents to register him as a voter in the Fourth precinct in the Second ward of the city of Detroit. The facts are stated in the opinion.

*Fred H. Warren,* in *pro. per.,* for relator.

*John W. McGrath,* for respondents.

CAMPBELL, J.   In this case, which was one of urgency, it was impossible to prepare a written opinion before decision.   But the confusion which seemed to exist in the minds of the board of registration makes it desirable to give our reasons, but as briefly as is consistent with the necessity of the occasion.

Relator was not denied or doubted to have chosen the city of Detroit as his actual and only domicile, and, being a citizen of the United States and of Michigan, it was open to him to choose it anywhere in the State or city.    Being a citizen and qualified voter of Detroit, the only question to be determined is that of the ward and precinct in which he must be registered.    It appears that

he is a single man, not having any family relations in Detroit, and having no household of his own over which he presides, or of which, with some other head, he is a member. He has a separate lodging in one ward, and a boarding place in another. We held that in such a case as this, where the voter is a resident, and the only question of residence for purposes of election is whether his lodging room or his boarding place governs, he should be registered where he boards.

Had the question been merely one of statutory construction on this one subject, it would need but a few words to explain why we think the construction given is the proper one in this State, and especially in Detroit. But the somewhat extraordinary and technical notions which are stated on the argument to have prevailed on the subject make it proper to refer to some of those elementary principles which are often carelessly overlooked.

There can never, in the eye of the law, be more than one domicile of citizenship; and that continues, in the case of a citizen, till he himself renounces it absolutely, and takes up another in its stead. And such a domicile is not lost by absence in the State or out of the State, whether within or without the United States. In the case of *Harbaugh v. Cicott*, 33 Mich. 242, that doctrine was very fully explained, and applied to a registered elector in Detroit whose family had lived for some years in Royal Oak, where he paid them weekly visits. It was held that he could not lose his residence in Detroit, unless he intended to renounce it in fact, no matter how long he or his family might be away.

No light can be thrown on the subject by the technical rules applicable to dwellings. Burglary and arson are crimes against the habitation; and it has always been held that an inhabited house, or part of a house, might be a

dwelling, if used as such at the time, or left with a pur-
pose of returning. But no one ever imagined that a
dwelling must be regarded as a domicile of citizenship.
There is no legal difficulty in one man's owning as many
dwellings, and in as many parts of the world, as his
choice and means may enable him to buy or occupy. All
are his dwellings, and are protected as such. But it is
not impossible that none of them is his domicile in this
sense. This subject of legal domicile, in the strict sense,
is referred to in the case of *Rue High,* 2 Doug. 515, and
*Campbell v. White,* 22 Mich. 178.

Our own Constitution is full on this subject, where it
lays down expressly, what would perhaps be implied, that
certain continuous presences or absences shall have no
effect on elective residence. By Article 7, § 5, it is pro-
vided that no elector—

" Shall be deemed to have gained or lost a residence by
reason of his being employed in the service of the United
States or of this State, nor while engaged in the naviga-
tion of the waters of this State or of the United States,
or of the high seas, nor while a student of any seminary
of learning, nor while kept at any alms-house or other
asylum at public expense, nor while confined in any pub-
lic prison."

And by section 7 it is declared:

" No soldier, seaman, nor marine in the army or navy
of the United States shall be deemed a resident of this
State in consequence of being stationed in any military or
naval place within the same."

These provisions do not prevent such persons from
becoming residents, if such is their purpose, and if they
are able to choose.

In the case of *People v. Blodgett,* 13 Mich. 127, where
it was held that the language of the Constitution, as it
then existed, prevented voting outside of the township or

ward of residence, it was not suggested or imagined that absence from the ward lost a residence; and, in the amendment allowing soldiers in the field to vote, the vote, when taken, is to be credited to the place of residence. Mere ·bodily presence or absence ˙can have no effect in determining residence, when once existing.    There is probably ˙not a precinct in any city which has not resident and qualified voters who spend most of their time in pursuits out of the ward or State; and persons who travel for pleasure or business, for long or short periods, do not loose their residence by such absence.    Senators and Representatives and other persons often occupy residences in Washington, but they are not disfranchised for doing so.    As explained in *Harbaugh v. Cicott*, a person cannot lose his residence, unless he voluntarily renounces it for another.

It is equally true that temporary abode in a city or ward does not make a person an elector.    Unless the person coming in does so with the honest and settled intention of obtaining a new domicile, he gains no rights. There is nothing in the law which makes colonized voters, imported for present purposes, entitled to claim the privilege of voting.

The inquiry before us, as already suggested, is, which of the two, lodging or boarding, determines the act of residence, when not otherwise determined?    It is always to be remembered that a citizen who has elected his domicile is entitled to enjoy it.    The only question is as to the particular action which indicates his choice.

It cannot be said that, where a man is isolated from all home belongings, there can be any particular preference in nature between one criterion and another.    It will probably be found that the same rule does not prevail everywhere; and in the absence of legislation it is

therefore a question of usage and local understanding, more than of principle. In our opinion the long-settled law and usage in this State have made this matter, as applied to different wards and precincts of the same city, one of no great difficulty. The question naturally arose as soon as cities were divided into wards. Detroit was for many years the only city so situated. As far back as 1839, and possibly earlier, we find mention of the matter in "An act relative to ward elections in the city of Detroit, and for other purposes" (Laws of 1839, pp. 31, 32), containing this provision:

"The residence of an elector, under this act, shall be the ward in which he boards or takes his regular meals."

This exact provision continued in force till 1857, when the city received an entirely new and elaborate charter, wherein, by section 2 of chapter 3, it was made the voter's place of residence "where he takes his regular meals." This was amended in 1861 by making the district that—

"In which his family resides, or in which is his regular boarding-house." Laws of 1861.

This change, introducing family relations, was very probably called for by some narrow construction which some one had given to the law as it stood. The family or household, whether composed only of relatives, or including, as it commonly does in law, all the members of the household, is the natural group of fellow-residents. Under the law of nations, the embassador's family includes all the persons attached to or employed in the embassy, and shares his immunity. A man who has any species of family ties is usually identified in residence, unless having a contrary intent. But the provision as to persons having no such relationship was continued, in substance, as before. Several charter amendments cover-

ing this section were afterwards made, but this was retained. In 1883 an entirely new charter was adopted, which, as we have had reason to discover, left out a good many things by evident carelessness, but retained . this. whole provision as to families and others, with no change in meaning. Local Laws of 1883, p. 585. In 1885 this section was recast, but these provisions were still kept. Local Acts of 1885, p. 286. In 1887 a change was made in the method of securing election inspectors, introducing radical changes, and departing entirely from the old charter methods; making, practically, an entirely new chapter on elections. By the substitution of this new system the old one dropped out; and in this way the chapter, which in its new shape has little or nothing to say about electors' qualifications, left no provision in force defining residence. Local Acts of 1887, p. 908. It is the silence of this new law which led the respondents to raise the question of relator's residence.

Had the old clauses been modified by simply dropping out the residence qualifications, and if this had appeared to be its purpose, it might, perhaps, have had some significance, if the part repealed had been a new innovation. But the change actually made was on entirely distinct matters; and it would be a rather strained construction which should assume any such radical purpose from mere silence. Where long and inveterate usage has existed for half a century unchanged, it is of itself, unless repugnant to some principle, of great force as a public custom. But here there was a legal determination begun under the old Constitution, and several times re-enacted under the new, with no legislative restriction or censure. A usage for so long a period, under express sanction of law, should be able to continue without further re-enactment, unless the legislative will is expressed to the contrary. There can be no presumption from mere silence, with no

substituted rule on the subject. It cannot be presumed that any Legislature means to set up different rules of suffrage in different parts of the State, so as to create inequalities among voters. What was the rule in Detroit was presumptively admissible elsewhere, in the absence of a different one. And no such idea has been promulgated by authority.

On the other hand, the Legislature has on several occasions applied the same test elsewhere. In 1873 a law was passed providing uniform rules for the government of cities to be incorporated or re-incorporated, and not provided with specific charters of their own. Laws of 1873, p. 244; How. Stat. chap. 80. By that statute it was provided that—

" The residence of any elector, not being a householder, shall be deemed to be in the ward in which he boards or takes his regular meals." Section 2420.

From that time to this many cities have been incorporated, and made subject to the provisions of this act. In no instance that has been brought to our attention has any charter adopted a different rule. On the contrary, going no further back than 1881 for comparison, no legislative session has passed without incorporating this provision into several charters. It would not be of much use to hunt up all these charters. A few will suffice to show that each Legislature has held the same views. We find this provision, in 1881, in Stanton and Bay City (Local Acts of 1881, pp. 39, 177); in 1883, in Escanaba, Menominee, St. Ignace, and West Bay City (Local Acts of 1883, pp. 47, 160, 240, 340); in 1885, in East Saginaw and Port Huron (Local Acts of 1885, pp. 354, 479); and during the same session, and at or about the same time when the Detroit charter was last amended, the Legislature of 1887 enacted the same rule in Adrian and Sault Ste. Marie

(Local Acts of 1887, pp. 141, 770).    These are examples only.    There is no contrary rule.

We do not feel justified in departing from what is so clearly indicated as the legislative understanding.   Should we attempt doing so, it could only be to set up a rule of our own, for there is certainly no clearly-established legal rule to the contrary.

It would also be going beyond our province to try to determine what reasons exist in favor of one rule or another.   It has not been found necessary to devise any statutory rule, except where one municipality is sub-divided into smaller precincts for one purpose or another. It can make no practical difference, in principle, where officers represent an entire ward, in what precinct of that ward a citizen votes, if he is a resident of the ward and only votes once.   A ward is the smallest election precinct required by the Constitution.   But convenience requires some subdivision, and the registration system favors residence in a precinct as a test of capacity.   Some persons may think a man's whereabouts most easily known, publicly, where he lodges.   Others may think daylight knowledge more certain to be publicly held.   Either rule would be competent for the Legislature, so long as no one is disfranchised.   But where there is local voting and local registration it is necessary to have some criterion, and this is the one which prevails here.

There is not much need of discussing the metaphysical or exceptional possibilities of difficulty from unreasoning verbal criticism.   They cannot be very numerous, and are chiefly imaginary.   It must be remembered that the right of voting is one which cannot be taken away by direct law or impossible conditions.   As already said, a man has a right to choose his domicile, and cannot be shut out of it.   If sailors, travelers, public officers, or others, who have honestly chosen their domicile, cannot be found to

come within the letter of any such provision as this, although there is less difficulty in it than extreme ingenuity might suppose, they cannot be disfranchised; and the rule must be applied, as it was meant to be applied, to cases where it can be. The primary rule of elections must always be to save the voter his rights. On the other hand, no one who is not a *bona fide* resident can eat himself into the quality of a voter. The period of residence required means actual and permanent sole residence, and not a few days' commorancy for the purposes of one election. A temporary resort to a precinct for no other honest purpose of residence is a fraud, and no residence, and gives no rights.

The *mandamus* has already been allowed.

SHERWOOD, C. J., CHAMPLIN and LONG, JJ., concurred with CAMPBELL, J.

MORSE, J., *(dissenting)*. The relator in this case is without question a resident of the city of Detroit, and entitled to be registered and to vote in said city. During his entire residence in said city he has taken his meals regularly at the Antisdel House, which is located in the Fourth precinct of the Second ward. For several months last past he has had his room, where he lodges, sleeps, and keeps his trunk, clothing, private library, and ornaments, at No. 69 John R. street, which is located in the Fifth precinct of the First ward. The relator is unmarried. The respondents, who constitute the election inspectors of the Fourth precinct of the Second ward, refused to register him as an elector, upon his application.

I cannot agree with the majority of the Court that Warren is a voter in the precinct in which he takes his meals. I attach no significance to the fact that the charters of the city of Detroit have heretofore contained pro-

visions to this effect. The charter at present contains no clause determining what place shall be considered the residence of a voter. I am not authorized to assume that the Legislature left out the former provision by mistake. We must assume, if we assume anything, that the Legislature did what they intended to do.

The general registration law governing the registration in the townships of this State, has never, since the policy of registration of voters was adopted in this State, particularly specified what the word " residence" meant, as applied to voters. I must take it for granted that the Legislature intended that hereafter the residence of an elector in Detroit must be established as it would be under the general law. What is a man's residence? It is his home. Where is his home? Is it where he rushes in and hurriedly takes three meals a day; where he spends just time enough to eat? Or is it where he has his room, and keeps his personal goods and chattels; where he spends his evenings and Sundays among his books, and keeps his easy chair and other articles of personal comfort or adornment?

If the inspectors had asked the relator where his home was, I think he would have answered, No. 69 John R. street, instead of the Antisdel House. Warren had something more than a mere lodging, a bed, at No. 69 John R. street. He had an abode, a dwelling, a habitation, a home, at John R. street. These words are all synonymous with "residence." If Warren had been a married man, rooming with his wife at this place, although both of them took their regular meals at the Antisdel House, no one would assert that their home or residence was at the hotel. Nor is it any more the home of Warren because he is single. The domicile of Warren was in his room, the same as if, instead of occupying one room, he had owned or rented a house, and lived as a single man

in it. This has been the common understanding and ruling under the general laws of the State throughout the State, as far as I have been able to learn of the ruling of election boards upon the question. It seems to me the only proper ruling, and one less liable to result in the perpetration of frauds in registration and in voting than the other.

In all the large cities in this country, many single men are living upon what is called the "European Plan." They have furnished rooms, and take their meals at no regular place; eating at some restaurant or hotel, wherever they may happen to be at meal times. Their homes are in their rooms, and not at the eating tables.

The election inspectors were right, and the *mandamus* ought not to issue.