STATE OF IOWA, Appellant, v. L. SAVRE.

**Elections:** PLACE OF VOTING: RESIDENCE. The precinct in which an unmarried man rooms and sleeps, rather than the one in which he takes his meals, will determine the question of his residence with respect to the right to vote.

**Illegal voting:** CONSTRUCTION OF STATUTE. To vote "willfully" in violation of Code, section 4921, involves either knowledge of disqualification or a reckless disregard of the question of qualification; and where one having ascertained all the facts in good faith concludes he is qualified and votes, the act is not willful although he in fact was not entitled to vote.

**Evidence of intent.** One charged with illegally voting in the wrong precinct may show that he acted upon legal advice based on a statement of all the facts, as bearing on the question of intent.

**Intent:** QUESTION OF FACT. Where the evidence showed that an elector voted in a precinct not his residence, and that in so voting he acted upon the advice of counsel, the question of his willful violation of the law was one of fact for the jury, and the direction of a verdict for defendant was erroneous.

*Appeal from Mitchell District Court.*— HON. J. F. CLYDE, Judge.

TUESDAY, DECEMBER 12, 1905.

THE defendant was indicted for illegal voting. After all of the evidence had been introduced a verdict of not guilty, by the direction of the court, was returned and the defendant discharged. The state appeals.— *Reversed.*

*Chas. W. Mullan,* Attorney General, *Lawrence De Graff,* Assistant Attorney General, *A. A. Kugler,* and *Eaton & Salisbury,* for the State.

*C. D. Ellis, H. G. Bartlett,* and *G. E. Marsh,* for appellee.

LADD, J.— The accused is alleged to have voted at the municipal election on March 27, 1905, in the First Ward of the city of Osage, when his place of residence was in the Third Ward. Section 1090 of the Code declares that " no person shall vote in any precinct but that of his residence," and section 642, relating to municipal elections, that " each qualified elector may vote thereat who is a resident of the city or town and, at the time, has been ten days a resident of the precinct in which he offers to vote." The penalty denounced for the violation of these statutes is found in section 4921, enacting that " if any person willfully vote who has not been a resident of this state for six months next preceding the election, or who, at the time of the election, is not twenty-one years of age, or who is not a citizen of the United States, or who is not qualified, by reason of other disability,

to vote at the place where and the time when the vote is to be given, he shall be fined in a sum not exceeding three hundred dollars, or imprisoned, in the county jail not exceeding one year." The defendant cast his ballot at the place alleged, and the issues raised on the trial were (1) had his residence been in that ward during the 10 days previous, and (2) if not, was his act in voting there willful?

I. The word "residence" as employed in the election statutes is synonymous with "home" or "domicile," and means a fixed or permanent abode or habitation to which the party when absent, intends to return. *Vandepoel v. O'Hanlon,* 53 Iowa, 246; *Sharp v. McIntire,* 23 Colo. 99 (46 Pac. Rep. 115); *State v. Aldrich,* 14 R. I. 171; Chase v. Miller, 41 Pa. 403; *Hannon v. Grizzard,* 89 N. C. 115. As said in the case first cited, "he is entitled to vote only in the county where his home is, where his fixed place of residence is for the time being, and such place is and must be his domicile or place of abode, as distinguished from a residence acquired as a sojourner for business purposes, the attainment of an education, or any other purpose of a temporary character."

1. ELECTIONS: place of voting: residence.

There is no absolute criterion by which to determine one's place of residence. Each case must depend on its particular facts or circumstances. Three rules, however, are well established: (1) That a man must have a residence or domicile somewhere; (2) when once established, it remains until a new one is acquired; and (3) a man can have but one domicile at a time. See 10 Am. & Eng. Ency. of Law (2d. Ed.) 598. Ordinarily little difficulty is experienced in determining the residence of a man with a family for it is, save in exceptional cases, where the family live or have their home. *Brewer v. Linnaeus,* 36 Me. 428. See *Schlawig v. De Peyster,* 83 Iowa, 324. But the occupation of single men is often such that they are seldom at the same place for any considerable time. And in determining their domicile it is of the utmost importance that the law be so

construed as not to deprive them of the right to exercise the privileges of citizenship. On the one hand, the intention alone cannot fix the place of abode, nor, on the other, can conduct in stopping for a time at a particular locality. One cannot by his intention alone fix his dwelling place, and his stay may be for a temporary purpose only. As observed in *Cohen v. Daniels,* 25 Iowa, 88, the intention and the acts must concur. This was lucidly explained in an opinion by Wright, C. J., in *Hinds v. Hinds,* 1 Iowa, 36: "True it is there must be the fact of the intent. Now, what fact? We answer, the act of abiding; the fact of a dwelling; a habitation; and having this residence — having an abode — this abode, this dwelling, then, if the intent exists, the domicile is perfect. In other words, the mere intent, without the fact of residence or abiding, cannot constitute the domicile. Neither can the intent, without having the abode, the home, the place to dwell, constitute the residence. Residence, as there used, we think, has reference to the fact that the citizen or person has a place that, to use an expressive word, is called 'home,' with no present intention of removing therefrom. Not that the person is to remain continuously there, in order to retain his residence or domicile, but if absent, for a long or short time, with the animus revertendi, the domicile still continues." See, also, *Whitcomb v. Whitcomb,* 46 Iowa, 437; *Fitzgerald v. Arel,* 63 Iowa, 104; *State v. Minnick,* 15 Iowa, 123.

Mere bodily presence or absence cannot have controlling effect in determining residence when once established. Many qualified voters spend most of their time in pursuits out of the ward or even the state. Persons who travel for business or pleasure for long or short periods do not lose their residence by such absence. But bodily presence ordinarily is essential in effecting a domicile in the initiative. One might intend to dwell in a place as his permanent abode, and yet never see it. So he might dwell there without thought of remaining. In neither event would he be a resident within

the meaning of the election laws. There must be the act of abiding without the present intent of removing therefrom. As said in Story on Conflict of Laws, sec. 41, there must be to constitute residence " an actual home, in the sense of having no other home, whether he intends to reside there permanently, or for a definite or indefinite length of time." The vital inquiry, then, in determining the residence of a person always, is where is his home, the home where he lives, and to which he intends to return when absent, or when sick, or when his present engagement ends.

In the case at bar it was made to appear from defendant's answers, when at the polls, that he had obtained two meals a day at the boarding house of Mrs. Henderson situated in the First Ward, and that his offices were located in the Third Ward, and that he had been in the habit of voting where he obtained his meals. Thereupon his right to vote was challenged, and he took the usual oath. On the trial it developed that he was a member of the firm of Hanson & Savre, engaged in the practice of medicine, having offices in the second floor of a building in the Third Ward. In these was kept the firm's medical library and a stock of medicines. There were two waiting rooms, a room for electrical treatment, two consultation rooms, a room with hot air apparatus, and a bathroom. Both Hansen and defendant were unmarried, and slept in a bed in the room where the electrical apparatus was kept. It contained no conveniences, save for sleeping. In defendant's consultation room were the usual equipments of such a place, but none for housekeeping. He had no trunk, but passed the usual office hours in the rooms, and spent his evenings there when not otherwise engaged. They had occupied these offices three years, during which time the defendant had taken his meals at as many different places. In 1903 he had procured them at Mrs. Collin's in the Fourth Ward, and later at the restaurant of a hotel in the Third Ward, and then at Mrs. Henderson's. This was in the Third Ward until the early winter,

when she moved into the First Ward, where she remained until shortly before April 1, 1905, when she returned to the Third Ward. The defendant purchased meal tickets — that is, tickets entitling him to twenty-one meals whenever he wished to eat — and took dinner and supper at Mrs. Henderson's when not out of town. Only such time was spent as is necessary and ordinarily incident to eating at a boarding house, such as reading a paper when waiting to be served or for a moment after eating. He seldom ate breakfast; but, when he did, he obtained it at a restaurant in the Third Ward.

The evidence was such as to leave no doubt of defendant's place of residence. It was not purely a matter of intention, as he had been advised. A person cannot live in one place and by force of imagination constitute some other his place of abode. The intent and the fact, as already stated, must concur. Surely a man's home is not an eating or boarding house, where he stops merely long enough to obtain food, be this two or three times a day. It has none of the essentials of a home, unless that of supplying the necessary food be one. It is ordinarily temporary, and is changed according to convenience or taste of the patron. Defendant tested three different places in as many years, and each in a different ward of the city, and to say that in making each change he established a new domicile is ridiculous. The home of an unmarried man is where he has his rooms in which he keeps such personal effects as he has, where he rests when not at work, and spends his evenings and Sundays. The defendant made the rooms of his office his home. Even though he testified that he had intended to make his home where he took his meals, he had never effectuated that purpose, for he continued to live at his offices. What he doubtless meant was that he intended to do so for the purpose of voting. But the actual place of residence controls, and one cannot be improvised by merely forming an intention to claim it elsewhere.

In *Smith v. Thomas* (Cal.) 52 Pac. Rep. 1079, one Phoebus had been a wood chopper for eleven years, but whenever out of work or sick he returned to Neal's place, in Vasalia, which he called home, and he was adjudged a resident of the ward in which such place was located and entitled to vote there. In *Behrenmeyer v. Kreitz*, 135 Ill., 591 (26 N. E. Rep. 704), an engineer operating a train between Quincy, Ill., and Hannibal, Mo., a distance of about twenty miles, usually started from Quincy at 5 o'clock p. m. each day and returned the next morning. He was unmarried, and took his meals at a boarding house in Quincy and had his washing done there. But he maintained a well-furnished room over a drug store in Hannibal, where he slept and which he claimed as his home, and his vote at Quincy was denounced as illegal.

In *Robinson v. Brewster*, 140 Ill., 649 (30 N. E. Rep. 683, 33 Am. St. Rep. 265), one Dwiggins kept store in the town of Ross, where he did all his business and boarded with his father, who lived there. About a year later his father moved into Grant township, and Dwiggins slept most of the time at his father's home, but a part of the time at the hotel in Ross. Ordinarily he took breakfast and supper at his father's, but often ate at the hotel or a boarding house, kept part of his apparel there, and part at the store, and was town clerk of Ross. The court held that his residence was in the town of Ross, saying: " He retained his business in the town of Ross, claimed that as his residence and his intention was to keep his residence in that town. The intention of a party has an important bearing on the question of residence, especially where the party is unmarried and has no family as the case was here. So long as he remained in the town of Ross engaged in his business, and treated that as his permanent abode, he had the right to cast his vote in that town." See, also, *Langhammer v. Munter*, 80 Md., 518 (31 Atl. Rep. 300, 27 L. R. A. 330). In *Warren v. Board of Registration*, 72 Mich., 398 (40 N. W. Rep. 553, 2 L. R. A. 203), it

appeared that the statute had been in force fifty years declaring that in ward elections in the city of Detroit the residence of the elector " shall be in the ward where he boards or takes his regular meals," and was then omitted from a new charter, and the court held that " usage for so long a period, under express sanction of law, should be able to continue without further re-enactment unless the legislative will is expressed to the contrary." The opinion inferentially admits that, but for the statute a different conclusion would have been reached. In *Inhabitants of Abington v. Inhabitants of North Bridgeport,* 23 Pick. (Mass.) 170, a house was located on the line between two towns, and the question to be determined was in which did a pauper reside. After citing English decisions to the same effect, the court, speaking through Chief Justice Shaw, declared that " if the line had divided the house more equally, we think, on the authorities, that, if it could be ascertained where the occupant habitually slept, this would be a preponderating circumstance, and, in the absence of other proof, decisive."

We conclude that as between the place where one rooms and sleeps and the place where he obtains his meals, without other facts indicating the contrary, the former must be regarded as his residence. It follows that defendant had never been a resident of the ward at which he voted.

II. The penalty of the law is denounced against any person who shall " willfully vote " in a precinct other than that of his residence. The State argues that by " willfully "

**2. ILLEGAL VOTING: construction of statute.** is meant no more than " intentionally," " deliberately," or " voluntarily." Several cases are cited in support of this contention. In *State v. Windahl,* 95 Iowa, 470, such is said not to be the proper definition, though as employed in the instruction and indictment, it meant intentional as distinguished from accidental. In *State v. Teeters,* 97 Iowa, 458, the accused was charged with obstructing the highway, and admitted that he had placed an obstruction to travel over the land alleged to

have been the road, and in these circumstances willful was held to be the same as intentional. But see *State v. Preston,* 34 Wis., 675. In *State v. Clark,* 102 Iowa, 685, election officers were indicted under section 4928, providing that, " if any such judge [of election] willfully refuse the vote of any person who complies with requisites as prescribed by law to prove his qualifications," he shall be punished. It is manifest that in this connection the motive is unimportant. If the voter has qualified, he is entitled to vote, and, if rejected, the only other question is whether this privilege was denied him through mistake or purposely. All held in *State v. Lightfoot,* 107 Iowa, 344, was that to charge that an act was committed " willfully and unlawfully " was not equivalent to saying that it was done maliciously. Much must necessarily depend upon the context and on the character of the act denounced in determining the true meaning of willful when used to characterize it. Often, when found in a penal statute, it is held to import something more than merely the intentional or deliberate doing of an act. In *Parker v. Parker,* 102 Iowa, 500, it was said to involve " a bad or evil purpose, as in violation of law, or wantonly and in disregard of the rights of others, or knowingly and of stubborn purpose or contrary to duty or without authority and careless whether he have the right or not." To the same effect, see *Werner v. Flies,* 91 Iowa, 146; *Kletsing v. Armstrong,* 119 Iowa, 505; *State v. Whitener,* 93 N. C. 590; *Wass v. Stephens,* 128 N. Y. 123 (28 N. E. Rep. 21); *Spurr v. U. S.,* 174 U. S. 728 (19 Sup. Ct. 812, 43 L. Ed. 1150); *Com. v. Kneeland,* 20 Pick. (Mass.) 206; *Williams v. People,* 26 Col. 272 (57 Pac. Rep. 701); *State v. Alcorn,* 78 Tex. 387 (14 S. W. Rep. 663); *Hateley v. State,* 118 Ga. 79 (44 S. E. Rep. 852).

It will be observed that the section denounces no penalty against those voting who are disqualified merely. To render these amendable to the law, it must also appear that they acted willfully in so doing. But it could not have been

the purpose of the Legislature to limit " willfully," as here used, to the mere intention of the elector to cast his ballot for every one in the possession of his senses who votes at all does so intentionally.   Manifestly the word has relation to the qualifications of the voter, and whether, notwithstanding his disqualification by reason of nonresidence, or nonage or not being a citizen of the United States, he has purposely persisted in participating in the election.  The duty devolves upon every citizen to use ordinary care in ascertaining his right to exercise the elective franchise, and, if one without qualification and careless whether he have the right or not votes, his lack of knowledge will furnish no excuse.    But, if a person upon due inquiry ascertains all the facts, and, basing his judgment on these in good faith, concludes that he is qualified to vote and does so, his act is not " willful," within the meaning of this statute, even though upon a more rigorous investigation, in the light of exact legal rules and maxims, it shall turn out that he was not in fact qualified. This does not mean that a mistake of law will afford any defense, for every one is presumed to be as familiar with the election laws as with others.   The cases relied on by the State are to this effect.   Thus it was held in *U. S. v. Anthony,* 11 Blatchf. 200, Fed. Cas. No. 14,458, that the belief that defendant had a right to vote was no justification, as she knew she was a woman and was conclusively presumed to know that the law did not extend the privileges of suffrage to women.    See, also, *People v. Barber,* 48 Hun (N. Y.) 198. In *Hamilton v. People,* 57 Barb. (N. Y.) 625, the statute prohibited persons convicted of felony and not pardoned from voting.   The accused had been so convicted when 17 years of age, and offered to prove that he had reason to suppose that, having been a minor, the statute did not apply to him.   This was rejected on the ground that ignorance of the law excuses no one.   In *State v. Boyett,* 32 N. C. 336, defendant knew he had not lived in the district the time required by statute, and in *State v. Hart,* 51 N. C. 389, de-

fendant voted in the county of Greene, when he resided in the county of Pitt, in which county only the law permitted him to vote for Governor.    In *McGuire v. State,* 7 Humph. 54, the accused, foreign born, had not obtained his second naturalization papers, though these were required to qualify him to vote.    See, also, *Thompson v. State,* 26 Tex. App. 94 (9 S. W. Rep. 486) ; *Gardner v. People,* 62 N. Y. 299 ; *State v. Shea,* 106 Iowa, 738.

It is manifest that in all of these cases the mistake was one of law solely, and, of course, the rule obtained in each that this furnished no excuse.    The distinction is noted in *McGuire v. State,* for, in illustration, the court said : " If the voter believe himself to be 21 years of age, when he is not, and vote, he does not know of the existence of the disqualifying act and may on that ground be excused.    But, if he knew that he is only 20 years of age, yet believes he is old enough in point of law to vote, such ignorance of the law will not excuse him.    If a voter honestly believes that he has resided six months in the county before the election, and the fact turns out otherwise, he may be excused.    But, if he knew that he has been only four months in the county before election, yet believes that to reside four months is, in point of law, residence enough, he shall not be excused.    If a voter believe that he was born in the United States, and it turns out that he was born in a foreign country, he may be excused.    But if he knows he is a foreigner, and has not taken the oath of allegiance to the United States, but has only made his declaration of renunciation, etc., and thinks the latter in point of law sufficient to entitle him to vote, this ignorance of the law shall not excuse him ; for he voted knowing a state of facts which, in point of law, disqualified him."

This distinction was emphasized in *Gordon v. State,* 52 Ala. 308 (23 Am. Rep. 575), where the charge of illegal voting was based on the minority of the accused.    The evidence tended to show that he supposed he was of age, and

the court, in sustaining an exception to a charge, said: "The precise time when a man arrives at the age of 21 years is a fact, knowledge of which he derives necessarily from his parents, or other relatives or acquaintances having knowledge of the time of his birth. If acting in good faith, on information fairly obtained from them under an honest belief that he had reached the age, he votes, having the other necessary qualifications, illegal voting should not be imputed to him. The intent which makes up the crime cannot be affirmed." *Com. v. Bradford,* 9 Metc. (Mass.) 268, is somewhat in point. There the statute provided that " if any person, knowing himself not to be a qualified voter, shall, at any election, willfully give in a vote for any officer to be chosen," he shall be punished. The court held that, in view of the requirement of knowledge, " willfully " meant " designedly " or " purposely," and, with reference to the *nisi prius* court's instruction that advice of counsel could not be regarded as negativing knowledge, said: " In order to convict a party under this statute, which is extremely liberal in this respect, it is necessary to prove, not only that the party had no right to vote, but that he knew it. As the qualification depends on domicile, and that is often a qualified question of law and fact, we have no doubt that if the voter in good faith and with an honest purpose to ascertain the right shall make a true statement of the facts of the case to a professional man, or any other man of skill and experience capable of advising him correctly, the evidence of such advice and the facts upon which it is taken are competent as bearing on the question whether he knew he had not the right to vote. For although the jury, with the aid of all the evidence laid before them, with the lights thrown upon it by an exposition of the rules of law, may be satisfied that he had not the qualification of residence, and, of course, had not the right to vote, yet they may also be satisfied that he did not know that he was not a legal voter; and the means he took to inform himself have a direct bearing on this last question." See, also, *State v.*

*Macomber,* 7 R. I. 349; *People v. Harris,* 29 Cal. 678; McCrary on Elections (4th Ed.) sec. 587 *et seq.* To vote willfully, when not qualified, necessarily involves either knowledge of disqualification or a reckless disregard of whether disqualified or not.

III. The determination of a person's place of residence is often difficult, and frequently depends upon nice distinctions and complicated questions of law and fact. For this reason a person who is in doubt as to where his residence is may state fairly all the facts to, and take the opinion of, persons learned in the law, and proof thereof is admissible as bearing upon his intent in casting his ballot. Such was the decision in *Com. v. Bradford, supra,* and is clearly to be implied from what was said in *State v. Sheeley,* 15 Iowa, 404. See, also, McCrary on Election (4th Ed.) 602. Such evidence has a tendency to show that the act of voting where disqualified was without intent, and that the voter acted upon the supposition that he was a resident, and therefore entitled to vote.

3. EVIDENCE OF INTENT.

IV. The defendant testified that he supposed that he was a resident of the First Ward, and voted there with that understanding. It also appeared that two years previous, being in doubt as to where he should vote, he took the advice of an attorney at law, who expressed the opinion that he might cast his ballot either where he roomed or where he boarded, according to the place he intended to regard as his home. This view seems to have been shared by two other attorneys of the same place, who also imparted to him the same advice. Contrary to the state's contention, the controlling facts were, then, like those existing when he voted in the First Ward. The record contains no circumstances to the contrary, save those detailed, demonstrating the absurdity of the proposition. That a candidate for office in the First Ward was a brother of his office boy, and that he was irritated by his right to vote being challenged, were of little significance in

4. INTENT: question of fact.

view of his practice for several years of voting where he obtained his meals. The court directed a verdict of acquittal. The case should have gone to the jury. Proof that the accused cast his ballot in a ward other than that of his residence made out a *prima facie* case for conviction. He was in possession of all the facts, and is presumed to have known the law. The only issue for submission involved a finding as to the condition of his mind, whether in what he did he acted willfully, and as bearing thereon his evidence that he supposed his residence was in the First Ward and the advice of the attorneys was admissible, but not conclusive.

As the state appealed, this ruling, not the judgment, is *reversed.*