UNITED STATES v. CHICAGO JUNCTION RY. CO. (four cases).

(District Court, N. D. Illinois, E. D.   November 28, 1913.)

Nos. 10,103, 10,406, 10,408, 10,608.

CARRIERS (§ 37*) — TRANSPORTATION OF CATTLE — 28-HOUR LAW — SWITCHING SERVICE.

Defendant railroad company maintains a switching service connecting various railroad lines with the Union Stockyards in Chicago, transporting cattle from the trunk line carriers to the stockyards for unloading in accordance with orders sent to defendant's servants from the stockyard company. Defendant transported certain cars of horses that had been confined in excess of the statutory period before they were delivered to defendant, consuming no more time than was reasonably necessary to perform the service of transporting the cars to the unloading chutes with the exception of one car, which was delayed because it was discovered, after it had been "spotted," that it could not be unloaded at the particular chute because the horses were not provided with halters. *Held,* that defendant was not guilty of knowingly and willfully confining the animals in violation of the 28-Hour Law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1911, p. 1341]).

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*]

Actions by the United States of America against the Chicago Junction Railway Company. Judgment for defendant in each case.

Four actions to recover penalties for alleged violations of the Act of June 29, 1906, "An act to prevent cruelty to animals while in transit." The facts covered by stipulation are:

The Chicago Junction Railway Company, the defendant, is a railroad corporation organized under the laws of the state of Illinois, and doing a railroad business wholly within the city of Chicago, in said state, and principally within the district comprising the Union Stockyards in that city. The Union Stockyards are owned and operated by a corporation known as the Union Stockyard & Transit Company of Chicago. The tracks owned and operated by the defendant at the present time and during the period of the alleged violations herein are located wholly within the city of Chicago, county of Cook, and state of Illinois. They consist of main tracks running east and west from a point on the lake front in the city of Chicago, near the intersection of Thirty-Ninth street and the tracks of the Illinois Central Railroad Company westerly 8¼ miles to a point in the city of Chicago. In addition to the main tracks running between those two points, the company operates a large number of switch tracks in and through the Union Stockyards district to the industries located there and to the various loading and unloading platforms of the Union Stockyard & Transit Company. The defendant does not own, lease, control, or operate loading and unloading platforms or facilities.

Car load shipments of horses, such as are involved in these cases, originating outside of Illinois, and destined to eastern points beyond Chicago, or to points in the Stockyards district, are transported from points of origin to Chicago in stock trains of the trunk line carriers, to a receiving track of the defendant, known as the "Horse Track," located at Fortieth street and Emerald avenue, Emerald avenue being the first street east of Halsted street, and are placed on the horse track by the trunk line carrier. The conductor on the trunk line carrier bringing the horses into Chicago takes his waybills to the south receiving office of the Union Stockyard & Transit Company at Fortieth and Laurel streets. These waybills are retained by the Union Stockyard & Transit Company in its possession until subsequently returned to the trunk line carrier and are never in the possession of the defendant. From

the waybills the Union Stockyard & Transit Company makes out a written order directed to the Chicago Junction Railway Company containing the following information and no other: Date, car initial, car number, loaded or empty, from what railroad, to what point, with the request, "Please switch the following cars." This order is taken to the live stock train director's office of the defendant, from which point the order is telephoned to the yardmaster's office of the defendant at Fortieth and Halsted streets. The yardmaster notifies the defendant's switching crew to take the cars on the receiving tracks and deliver them to the point designated in the order. The defendant's switching crew then takes the car on the receiving track and delivers it to the particular unloading platform of the Union Stockyard & Transit Company designated by the order where the cars are unloaded by employés of the Union Stockyard & Transit Company. These various unloading platforms are designated "Express Chutes," "Michigan Central Chutes," and "Fort Wayne Chutes." After the cars are once set at the particular chutes designated in the written order, the defendant has no further control over the shipment, and the shipment is entirely in the charge of the Union Stockyard & Transit Company employés. In the usual course of business, 15 or 20 minutes after the cars are set out on the receiving tracks, orders have been received by the defendant to switch the cars, and this is done usually in from one to two hours. The defendant acts merely as a switching carrier in accordance with the orders given it and at no time sees the waybilling or has any information as to the point of origin of the horses, or the time they have been confined in the cars, or whether during transit they have been unloaded for feed, water, and rest. For the services performed by the defendant it receives a fixed switching charge from the trunk line carrier.

After the horses have reached the receiving tracks, the quickest and only way in which they can be unloaded is by the performance of the switching service by the defendant from the receiving tracks to the unloading platforms of the Union Stockyard & Transit Company. These facts apply to all of the cases involved in this stipulation.

The particular facts with reference to case No. 10,103 are as follows:

Chicago, Milwaukee & St. Paul car No. 1233 was loaded with 22 head of horses at Kansas City, Mo., on May 19, 1908, at 6 p. m. by B. & G. Walcott, consigned to A. H. Morgan, Portland Avenue Yards, Rochester, New York. The car was set out by the trunk line carrier on the Horse Track of the defendant at 6:25 a. m. May 21st; ordered by the Union Stockyard & Transit Company to the Michigan Chutes, and delivered to the Michigan Chutes at 7:30 a. m. by the Chicago Junction Railway Company, with its engines No. 35 and was unloaded at said chutes at 8:15 a. m., the car having been in the possession of the defendant, Chicago Junction Railway Company, one hour and five minutes before delivery by said defendant to said chutes; and said horses having been in said car at said chutes of the Union Stockyard & Transit Company 45 minutes and having been in the possession of the trunk line carrier 36 hours and 25 minutes, or 8 hours and 15 minutes in excess of the 28-hour period. At the time the shipment was loaded at Kansas City, a 36-hour request, as provided by the act, was made and executed by the shippers, thus making the total time of excess confinement 2 hours and 15 minutes. The total time of confinement allowed by the act expired prior to the delivery of the car to the defendant.

The particular facts with reference to case No. 10,406 are as follows:

A. T. & S. F. car No. 45767 was loaded with 26 horses by J. E. Eash, of Springer, N. M., at Kansas City, Mo., February 5, 1910, at 11:30 a. m. consigned to J. S. Eash, Shipshewana, Ind. The car was set out on the Horse Track of defendant by the trunk line carrier at 1:00 a. m. February 7, 1910. Orders were received from the Union Stockyard & Transit Company to deliver the car to Express Chute. Chicago Junction engine No. 116 delivered the car to the Express Chute for unloading at 3:10 a. m. At 4:15 a. m. the Union Stockyard & Transit Company gave the defendant orders to switch the car from the Express Chute to the P. F. W. & C. Chute, so that the horses could be unloaded at that point. This was done for the reason that the horses were western horses and had no halters on them, by which they could be led

into the barn at the Express Chute. The car was moved to the P. F. W. & C. Chute at 7:30 a. m. and unloaded at that point at 8:50 a. m. The car was in the possession of the defendant Chicago Junction Railway Company 5 hours and 25 minutes before delivery by said defendant to said chutes, and said horses were in said car at said chutes of the Union Stockyard & Transit Company 2 hours and 25 minutes, and had been in the possession of the trunk line carrier .37 hours and 30 minutes, or 16 hours and 20 minutes over the 28-hour period, and 9 hours and 20 minutes over the 36-hour period.

At the time said shipment was loaded at Kansas City, a 36-hour request as provided by the act was made and executed by the shippers, thus making the total time of excess confinement 9 hours and 20 minutes. The total time of confinement allowed by the act expired prior to the delivery of said car to the defendant.

The particular facts with reference to case No. 10,408 are as follows:

C., M. & St. P. car No. 2245 was loaded with 21 horses, by John Sharkey, of Mellette, S. D., February 12, 1910, and reloaded at 10:30 a. m. February 14, 1910, at Sioux City, Iowa, consigned to John Sharkey Belleview, Mich. The car was set out on the Horse Track of defendant by the trunk line carrier at 5:20 a. m. February 26th, was ordered by the Union Stockyard & Transit Company to the Grand Trunk Chutes, and was delivered to the Grand Trunk Chutes at 7:35 a. m. by the Chicago Junction Railway Company engine No. 35, and was unloaded at that point at 8:15 a. m. The car was in the possession of the defendant Chicago Junction Railway Company 2 hours and 15 minutes before delivery by said defendant to said chutes, and said horses were in said car at said chutes of the Union Stockyard & Transit Company 40 minutes, and in the possession of the trunk line carrier 42 hours and 50 minutes, or 14 hours and 45 minutes over the 28-hour period, or 9 hours and 35 minutes over the 36-hour period.

At the time said shipment was loaded, a 36-hour request, as provided by the act, was made and executed by the shipper, thus making the total time of excess confinement 9 hours and 35 minutes. The total time of confinement allowed by the act expired prior to the delivery of said car to the defendant.

The particular facts with reference to case No. 10,608, are as follows:

Chicago & Alton car 29209 was loaded with 22 head of horses by J. C. Stevens at Kansas City, Mo., April 22, 1911, at 5:45 p. m., consigned to J. C. Stevens, Courtland, N. Y. This car was set out on the Horse Track of the defendant, by the Trunk Line carrier at 6:35 a. m., April 24, 1911; was ordered by the Union Stockyard & Transit Company to the Michigan Central Chutes and delivered to the Michigan Central Chutes by the Chicago Junction Railway Company engine No. 130 at 7:45 a. m. April 24th; unloaded at that point at 8:25 a. m. The car was in the possession of the defendant, Chicago Junction Railway Company, 1 hour and 10 minutes before delivery by said defendant to said chutes; and said horses were in said car at said chutes of the Union Stockyard & Transit Company 40 minutes and in the possession of the trunk line carrier 36 hours and 50 minutes, or 38 hours and 40 minutes —total confinement, being 10 hours and 40 minutes over the 28-hour period and 2 hours and 40 minutes over the 36-hour period.

At the time the shipment was loaded at Kansas City, the 36-hour request as provided by the act was made and executed by the shippers, thus making the total time of excess confinement 2 hours and 40 minutes. The total time of confinement allowed by the act expired prior to the delivery of said car to the defendant.

J. H. Wilkerson, U. S. Atty., of Chicago, Ill.
Winston, Payne, Strawn & Shaw, of Chicago, Ill., for defendant.

GEIGER, District Judge (after stating the facts as above). The fact that the defendant's functions are limited to a terminal, switching, or interchange service, while not relieving it from the obligations of the statute, is of controlling importance, when considered with the

further concession that, in the situation presented in each of the cases before us, the "quickest and only way in which they (the confined horses) can be unloaded, is by the performance of the switching service by the defendant from the receiving tracks to the unloading platforms of the Union Stockyard & Transit Company." There are cases which intimate that, when the statutory period of permissible confinement of cattle has expired, a connecting carrier receives a shipment at its peril; that it conclusively assumes liability for the penalty. In the cases before us, such a rule would result, necessarily, in continuing the very cruelty which the statute was designed to avoid; because, if such be the rule, it must follow as a corollary that the carrier could refuse to receive the stock. The reasonable construction requires in each case a determination whether the particular carrier knowingly and willfully failed to discharge its obligation under the statute. In other words, it is merely a question of proof. In three of the present cases there is no evidence to support the government's contention. In none of them was the time consumed in the performance of the switching service substantially in excess of what is conceded to be within the bounds of diligence, to wit, from one to two hours. As indicated, the peculiar character of the defendant's service as a switching carrier, not only permits, but requires, recognition of matters of common knowledge, among which is the necessarily slow movement of cars in a congested terminal district. Hence, as compared with ordinary movement of trains outside such district, the same inference cannot be drawn from the lapse of time. In the three cases referred to, it was therefore incumbent upon the government to prove something in addition to the fact that the permitted period of confinement had expired before the cars came to the possession of the defendant, and the further fact that the latter took from one to two hours to bring them to the unloading platform. This is particularly true in view of the fact that the defendant did not have actual knowledge of the expiration of the statutory period.

In the fourth case, No. 10,406, the car was in the possession of the defendant company something like five hours. In view of the stipulation that the ordinary time for performing the service was from one to two hours, this much longer time, if unexplained, might well give rise to an inference of culpable delay. But the stipulation discloses that such car was originally placed at one chute, and then it was discovered that the horses in the car were not equipped with halters to enable unloading at that point—a condition necessitating their transfer to another chute. There is nothing to show that the first delivery was made with knowledge of the situation, or that the defendant was in any respect culpable in not appreciating the uselessness of the original delivery. On the contrary, it must be assumed that the reason for making the change was in fact a good reason, whose recognition was consistent with the proper care of the horses in the defendant's charge, notwithstanding the obligation speedily to unload them.

It has been said that a failure "knowingly and willfully" to observe the statute means that a carrier, having a free will or choice, either intentionally disregards the statute, or is plainly indifferent to its re-

quirements. C., B. & Q. Ry. Co. v. United States, 194 Fed. 342, 114 C. C. A. 334. In view of the limited connection of the defendant with the transportation of the horses in question, the admitted facts do not justify such inferences in the cases before us.

Judgment may be entered for the defendant in each case.