UNITED STATES v. PHILADELPHIA & R. RY. CO.

(District Court, E. D. Pennsylvania.   May 14, 1915.)

No. 3296.

1. CARRIERS ☞37—TRANSPORTATION OF ANIMALS—STATUTES.
    The obligation imposed on carriers by Act June 29, 1906, c. 3594, 34 Stat. 607 (Comp. St. 1913, §§ 8651–8654), prohibiting carriers in interstate commerce from confining animals in cars for a longer period than specified without unloading for rest, water, and feed, and providing that animals so unloaded shall be fed and watered during the rest, and declaring that any carrier knowingly and willfully failing to comply with the act shall be liable to a penalty, is imposed on carriers as such, and only as long as the animals are in the course of transportation, and a carrier must provide itself with the means of the performance of the duty imposed on it, by having relay stations at such places along its lines, so that the animals during transportation may be unloaded, watered, and fed, and any failure

of the carrier to comply with the act must be knowingly and willfully done to subject it to a penalty.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. 37.]

2. CARRIERS 37—TRANSPORTATION OF ANIMALS—STATUTES.

Failure of a carrier to unload animals during transportation for rest, water, and feed, as required by Act June 29, 1906, must be without any excuse by the intervention of unavoidable or unanticipated causes, and the act meets special exigencies and conditions; and where the transportation ends within the time limit a carrier need not, to escape liability therefor, provide for the care of the animals.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. 37.]

3. CARRIERS 37—TRANSPORTATION OF ANIMALS—STATUTES—REGULATIONS— "WILLFULLY."

A carrier of animals delivered them on the consignee's private track opposite a runway for unloading, and notified the consignee to unload, within the time limit fixed by Act June 29, 1906; but the animals were not unloaded until about six hours after the expiration of the time limit, because the consignee's place of business was closed at the time the cars were placed for unloading, and because stormy weather rendered unloading impracticable. The carrier had notice of the conditions prevailing at the place of delivery. *Held,* that the carrier was not subject to the penalty imposed, though the act committed by it was knowingly done, for it was not guilty of willfully confining the animals in cars beyond the time limit, for the word "willfully" carries with it the thought of an intentional ignoring of the law or of indifference to its provisions.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. 37.

For other definitions, see Words and Phrases, First and Second Series, Willful.]

Action for a penalty by the United States against the Philadelphia & Reading Railway Company. Judgment for defendant.

Robert J. Sterrett, Asst. U. S. Atty., and Francis Fisher Kane, U. S. Atty., both of Philadelphia, Pa., for the United States.

Wm. Clarke Mason, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. This is an action for the penalty imposed by the act of Congress of June 29, 1906. By agreement trial by jury was waived and the cause heard by the court. It is one of several like, or at least similar, cases. The questions involved arise out of this state of facts:

A car load of 150 hogs were shipped from the National Stockyards in Chicago, consigned to A. H. March Packing Company at Bridgeport. They were unloaded, watered, and fed in Pittsburgh, and there transferred to car P. L. 647680 and transported over defendant's railroad to destination. The place of delivery at which the carriage ended was in the freightyard of defendant at a point on a siding opposite a runway or chute leading into a cattle pen. This consisted of a space inclosed with a fence. There was no shelter provided, and no construction other than the inclosing fence. The car reached the chute at 8 o'clock, and the consignees were notified at 9:30 p. m. of March 6, 1914, to unload. The latter hour was 2 hours within the time limit.

The hogs were not unloaded until 6:15 a. m., 6 hours and 45 minutes beyond the time limit.

There were two causes of delay, both of which were operating to prevent unloading. One was that the consignees' place of business was closed between 5:30 p. m. and 6 o'clock a. m., and there were no men at hand to drive the hogs, and besides this it was not practicable to drive them in the dark. The other cause was that a storm, which could be fairly characterized as a blizzard, was raging at the time. The weather was cold and there was a heavy fall of snow upon the ground. Good judgment dictated that the hogs be kept in the car, in preference to being turned into the open pen. The practice was to turn hogs into the pen. From this they were taken by the employés of the consignees to the yards of the latter, which were from one-fifth to one-quarter of a mile away.

The defendant company had direct notice of the conditions prevailing at this place of delivery. Shipments of hogs reached the siding at times after dark, and the hogs could not be taken from the pen until the next morning, and after the expiration of the feeding time limit. The A. H. March Company was the only consignee to whom deliveries were made at this pen. For whatever bearing this fact may have upon the case, it is found that the siding and pen were maintained for the sole use of this consignee. The notice of conditions was directly given to the railroad company in an application to have the railroad company provide a pen which gave shelter to the hogs—proper and suitable protection. This the railroad company declined to do, thinking it would involve providing like accommodations to every shipper. This would have been impracticable.

[1] Before formulating the specific questions which arise in this case out of its special facts, a few general observations may be helpful. It is to be recalled that the primary obligation of feeding these hogs was not upon the railroad. The obligation which is imposed upon them by the act of Congress is imposed upon them as a carrier, and only as long as the animals are in the course of transmission over the railroad. Moreover, what the railroad is required to do is required of it because of the default of the owner of the animals from whom by law the railroad can recoup the expenses to which it has been subjected. All of which the railroad company is called upon to do is therefore done during the carriage, and cannot be done after the carriage has ended. The motive behind this legislation is in one of its phases at least what may be characterized as humanitarian. The element of cruelty enters into the act of omission for which the penalty is imposed. The act of the carrier must have been "knowing and willful."

[2] More than this, or as part of it, the act of omission must be one without the excuse of the intervention of unavoidable or unanticipated causes interfering with or preventing the things required to be done. In the instant case, the carriage was complete and the "transporting" was at an end. Had the hogs been unloaded in fact, the delivery would have been complete, and the responsibilities of the carrier would have ended, unless this further obligation rests upon them to

have constructed and maintained such a pen as would permit the care required by the Act to be given the animals. As a practical matter, this is the real question in the case. The act of Congress is one enacted for such a purpose that the obligation which it imposes should not be weakened, nor its binding force lessened, by mere construction. It is just as clear, however, that there was no purpose or intention to impose unjust restrictions or duties impracticable of performance upon carriers. The exceptions and provisos introduced into the act give it the elasticity required to meet special exigencies and conditions. It is the fair intendment of the act that the carrier should provide itself with the means of the performance of the duty imposed upon it. This the defendant company has done by having relay stations at such places on its lines as that animals during transportation may be unloaded, watered, and fed.

We do not find in the act any requirement, where the transportation ends within the time limit, that they shall provide for the care of the animals thereafter. We therefore cannot find in this case the obligation was upon the railroad company to have provided the shelter sheds suggested. Where the delivery place is one of common delivery, and the carrier has reason to anticipate that cattle unloaded there will or may be kept beyond the time limit before being passed over to the care of the consignee, the obligation in such cases might be visited upon it; but it could only be because there the delivery under such circumstances might be held not to be complete.

[3] We are further unable to find in this case that the defendant company knowingly and willfully confined these hogs in the cars for more than 36 consecutive hours. The confinement beyond the limit here was due, as we find, to the fact that the care of the animals was prevented by storm, and causes which were unavoidable and could not have been anticipated or foreseen under all the circumstances affecting this shipment. This conclusion is in accordance with the adjudged cases. The act of omission committed by defendant was "knowingly" done. "Willfully," however, is an attitude of mind and will. It carries with it the thought of an intentional ignoring of the law, or of indifference to its provisions. There is nothing to justify such a finding in this case. It cannot be found in the bald fact that the hogs were confined more than 36 hours, when it also appears that they were not in transit after the time limit. The act was intended "to prevent cruelty to animals in transit," or at least "while in custody for transit." B. & O. v. U. S., 220 U. S. 106, 31 Sup. Ct. 368, 55 L. Ed. 384.

Had there been the further element of a free choice on the part of the railroad managers, had there been, or to meet the requirements of the act should have been, an unloading place to which the animals might have been taken, a different finding might have resulted. The facts are, however, these: The railroad had performed its task of transportation within the time limit. An exigency confronted it. This called for the exercise of judgment. For all we know, the carriage of the car to a place of unloading would have been fruitless of benefit to the hogs. To have technically relieved the carrier of responsibility by unloading the hogs upon the consignee would have been an added

cruelty. It cannot be said the railroad did not do the best which could have been done under the circumstances. Its managers certainly cannot be said to have been guilty of "willful cruelty," nor can the railroad justly be said to have failed in the performance of its duty, unless its duty was to have provided unloading sheds at every place of delivery. Criticism of the railroad in this case is indeed confined to this. The answer is that, whenever it is the will of Congress to place this measure of duty upon them, the law will so read.

We have followed the rulings in the cases of St. Josephs v. U. S., 187 Fed. 104, 110 C. C. A. 432; Chicago v. U. S., 194 Fed. 342, 114 C. C. A. 334; U. S. v. Lehigh Valley, 204 Fed. 705, 123 C. C. A. 9; U. S. v. Chicago (D. C.) 211 Fed. 724. There is no occasion for special findings. We find the defendant not to have been guilty of the acts calling for the imposition of the fine.

Judgment, therefore, is directed to be entered in favor of the defendant.