**FIRST COMMODITY CORP. OF BOSTON and Richard Badoian, Petitioners,**

**v.**

**COMMODITY FUTURES TRADING COMMISSION, Respondent,**

**and**

**John Ruddy, Respondent.**

**No. 81–1245.**

United States Court of Appeals, First Circuit.

Argued Nov. 4, 1981.

Decided March 25, 1982.

Jeffrey V. Boxer, Boston, Mass., for petitioners.

Joan L. Loizeaux, Special Counsel, Washington, D. C., with whom Gregory C. Glynn, Gen. Counsel, and Susan A. Arnold, Atty., Washington, D. C., were on brief for respondent Commodity Futures Trading Commission.

Before COFFIN, Chief Judge, DAVIS,* Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

This case raises the issue of what "scienter" requirement, if any, the Commodity Futures Trading Commission ("CFTC" or "Commission") must attach to its rule prohibiting fraud in the sale of foreign futures contracts in the United States. We conclude that the Commission here found that the broker committed fraud with a state of mind amounting to "recklessness," that the record supports that finding, and that the Commodity Exchange Act, 7 U.S.C. §§ 1–24 allows the Commission to predicate liability upon that state of mind. We therefore affirm the Commission's determination of liability.

**I**

**A**

To understand the facts of this case, it is well to have in mind three concepts elementary to those who work in the world of commodities trading but not necessarily clear to the rest of us.

First, one must understand the meaning of an "option," and, in particular, a "call option." A "call option" is a contract that gives one the right to buy a specified quantity of a given commodity at a particular price at any time until the option expires.

* Of the United States Court of Claims, sitting by    designation.

Thus, a coffee call option with an expiration date of December 31, 1982, and a "strike price" of $1,000 per ton would give the holder the right to buy the specified number of tons of coffee at $1,000 per ton anytime during 1982. If the market price of coffee goes above $1,000 per ton at any time during 1982, the holder can exercise (or, as is more normally the case, simply sell) the option and make money. Of course, the holder had to pay something for the call option, so he must hope the market price exceeds the strike price by enough for him to recover the cost of the option itself as well as commissions. *See generally British American Commodity Options Corp. v. Bagley*, 552 F.2d 482, 484–85 (2d Cir.), *cert. denied*, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1978).

Second, one must understand what a "futures contract" is and, in particular, a "short futures contract." A futures contract is a firm commitment to deliver or receive a specified amount of a given commodity at a particular price and time in the future. A futures contract does *not* give one a mere option to buy or sell; rather, it *is* a purchase or sale. A December "short" coffee future, for example, obligates the holder to deliver the specified quantity of coffee in December for a price specified right now, say $1,000 per ton. The holder of the "short" futures contract hopes the price of coffee will fall below that $1,000 before he has to deliver. If so, he can buy the coffee for the future delivery he has promised at the lower price and he will be able to keep the difference between the $1,000 specified price and his lower purchase price (less any commissions). The lower the price of coffee falls, the greater the "short" party's profit. *See generally Leist v. Simplot*, 638 F.2d 283, 286–87 (2d Cir. 1980), *cert. granted*, 450 U.S. 910, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981).

Third, it is important to understand the way in which a short futures contract can offset or "hedge" a call option. If an investor holds a call option on coffee, every dollar that the price of coffee rises makes that option worth about a dollar more. At the same time, if an investor holds a short futures contract on coffee, every dollar that the price of coffee rises makes that short contract worth about a dollar less. When an investor holds *both* a call option and a short futures contract, these gains and losses cancel one another out. Thus, even if the price of coffee rises to $8,000 per ton, an investor holding a call option and a short futures contract (both covering, say, one ton of coffee at $1,000 per ton) will not make money. The call option gives him the right to buy that $8,000 coffee for $1,000. The short futures contract, however, obligates him to turn around and deliver that same coffee to a buyer who will pay only $1,000. In fact, because the call option and the short contract offset each other as the price of coffee rises, no matter how high the price goes the investor will not even recover the cost of the option and the trading commissions.

As the price of coffee falls, on the other hand, the value of the call option and the short futures contract do not precisely offset each other. This is so because the investor who buys a call option cannot lose more on that investment than the cost of the option itself. Since he holds only a *right* to buy, not an *obligation* to buy, if the price of coffee falls, his right becomes worthless and he simply does not exercise it. There is no corresponding limitation, however, on the amount one can gain on a short futures contract as the price of coffee falls. The only limiting factor on this profit is the specified sale price he is to receive on delivery. If the price of coffee falls to zero, the investor in our example will make $1,000 on the ton of coffee he sold short.

Thus, an investor who holds both a $1,000 1982 coffee call option and a matching short $1,000 futures contract has hedged in the following sense: if the price of coffee *rises*, the investor cannot make money; he will lose the cost of the call and trading commissions; but he will lose no more. If the price of coffee *falls*, however, his position is better: if it falls a little, he can lose some of the cost of the call and commissions; if it falls further, he may break even; and if the price falls far enough, he may even make money. *See Flasman v. R. G. Wilson Commodities, Inc.*, [1977–1980 Transfer Binder]

Comm.Fut.L.Rep. (CCH) ¶ 20,572 (CFTC March 13, 1978).[1]

With these concepts in mind, we turn to the facts of this case.

## B

In June 1975, John Ruddy bought several call options on coffee through Richard Badoian, a sales representative at First Commodity Corporation of Boston ("FCCB"). The options cost Ruddy about $1,900 altogether and gave him the right to buy 15 tons of coffee at a price of about $1,080 per ton at any time before the end of the year. The nature of Ruddy's job, his low salary, his small amount of savings, as well as his correspondence with Badoian, suggest that he was very inexperienced in the world of commodities trading.

During June, Ruddy and Badoian corresponded and spoke several times by phone. The price of coffee began to fall. Ruddy wrote to Badoian, expressing concern. He noted,

> from anything I get a hold of, there seems to be a lot of coffee around. However, I'm sure with you having first hand information, you can see things I can't. I can only ask that you take any action necessary to protect me the same as you would if it was your money.

Badoian then called Ruddy. According to Ruddy's testimony, which the ALJ and the Commission credited below, Badoian told Ruddy that FCCB expected a "temporary downtrend" in the market. Badoian advised Ruddy "not to worry," however, because Ruddy could "take advantage of this additional chance to make money by placing a hedge."

Badoian sought to explain to Ruddy over the phone what a "hedge" was, but Ruddy testified that he never fully understood it. He was left with the impression that the "hedge" would make money for him if the price of coffee fell, and that he could lose everything (the price of the calls, commission costs, and short sale deposit, or "margin") only if "coffee stayed within a very limited price range." Ruddy testified that he specifically asked Badoian if the "hedge" would "hurt" his "up position" and that Badoian responded,

> Definitely not. You can pick up the extra money and when the coffee goes up, we just automatically pick up the hedge for [a] small fee.

Ruddy added that he told Badoian to "do nothing to hurt my up position," and that Badoian replied, "Don't you worry about a thing. Let me do the worrying and we'll make enough to pay for your daughter's wedding." Finally, Ruddy testified that he

> was in no way made aware that [the hedges] were shorts, selling or anything else. I ... agree ... that these are probably quite familiar terms to [the brokers at FCCB] but to me, a hedge, you might as well have been talking about a hedge fence.... Mr. Badoian knew this.

In fact, what Badoian had in mind as a "hedge" was a short futures contract traded on the London futures market. He sold several such contracts for Ruddy's account, offsetting Ruddy's call options.

As the very fact that this case is before us no doubt suggests, the price of coffee then stopped its fall. Indeed, a "killer" frost in Brazil on July 17 led to a sharp price increase. Ruddy thought he was a "rich man." He called FCCB on July 21, was unable to reach Badoian, and spoke instead to a manager named John Howe. Howe told Ruddy that FCCB had decided it could not remove his "short" hedges when the price began to go up, because doing so would have been too expensive. Gradually, through subsequent conversations with a lawyer at the CFTC, it began to dawn on Ruddy that he was not rich. Indeed, because of the "hedge" he obtained no profit at all when the price of coffee went up.

Ruddy then filed a reparation complaint with the CFTC, see 7 U.S.C. § 18, seeking

---

1. In the words of the ALJ in the CFTC proceeding cited in text, a call option with a short hedge

   > has almost the same effect as a put option, *i.e.*, no money is made unless the price [of the underlying commodity] *falls* enough to recoup the option premiums and more. A call option with a short hedge will be worthless as long as the price of [the commodity] stays *above* the strike price.

**4**

to recover from Badoian and FCCB the lost profits on his call options. The CFTC found that Badoian violated Rule 30.02, which makes it unlawful to "deceive or attempt to deceive" or to "make . . . any false report or statement" to a customer in connection with the sale of commodity futures contracts on foreign exchanges.[2] The CFTC ruled that Badoian had made material misrepresentations about the effect of the short futures contracts on Ruddy's "up" position and that Ruddy had relied upon these representations to his detriment. The CFTC went on to hold that it had the power to find a violation of Rule 30.02 without finding that Badoian had acted with "scienter," i.e., without finding that he had acted "willfully." The CFTC found in any event that Badoian had "willfully" made the misrepresentations at issue. Badoian and FCCB (held jointly and severally liable for Badoian's conduct) seek review in this court of the CFTC's consequent award to Ruddy of approximately $10,000 in damages. See 7 U.S.C. §§ 9 and 18(g).

## II

### A

The petitioners, Badoian and FCCB, claim that the CFTC lacks the power to hold them liable under Rule 30.02. They concede that the *language* of the rule does not contain a "scienter" requirement. They argue, however, that the rule is inconsistent with the CFTC's authorizing statute unless the CFTC reads such a requirement into the rule—that is, unless the CFTC reads into the rule a requirement that misrepresentations be "willful," which the petitioners take to mean "intentional," in order to support liability. The CFTC takes the polar opposite position, claiming authority to promulgate an antifraud rule without any scienter requirement.

Several substantial arguments can be made in support of petitioners' claim. To begin with, the primary antifraud provision in the statute itself, 7 U.S.C. § 6b, which governs *domestic* futures transactions, has a specific willfulness, or "scienter," requirement.[3] See *CFTC v. Savage*, 611 F.2d 270, 283 (9th Cir. 1979); *Master Commodities, Inc. v. Texas Cattle Management Co.*, 586 F.2d 1352, 1356 (10th Cir. 1978); *Haltmier v. CFTC*, 554 F.2d 556, 562 (2d Cir. 1977); *Silverman v. CFTC*, 549 F.2d 28, 31 (7th Cir. 1977); *Economou v. Department of Agriculture*, 494 F.2d 519 (2d Cir. 1974) (per curiam); *McCurnin v. Kohlmeyer & Co.*, 347 F.Supp. 573, 575–76 (E.D.La.1972), aff'd,

---

2. Rule 30.02 provides:

   *Fraud in connection with transaction in futures contracts other than on domestic contract markets.*

   It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any account, agreement or transaction involving any contract of sale of a commodity for future delivery, traded or executed on any board of trade, exchange or market other than a contract market designated pursuant to Section 5 of the Act, as amended:

   (a) To cheat or defraud or attempt to cheat or defraud any other person;

   (b) To make or cause to be made to any other person any false report or statement thereof or to enter or cause to be entered for any person any false record thereof;

   (c) To deceive or attempt to deceive any other person by any means whatsoever in regard to any such account, agreement or transaction or the disposition or execution of any such account, agreement or transaction or in regard to any act of agency performed with respect to such account, agreement or transaction; or

   (d) To bucket any order, or to fill any order by offset against the order or orders of any other person or without the prior consent of any person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.

   17 C.F.R. § 30.02 (1981).

3. That provision states that

   It shall be unlawful . . . for any person . . . in connection with any order to make . . . any contract of sale of any commodity for future delivery, made . . . on . . . any contract market, for or on behalf of any other person . . .

   (A) to cheat or defraud or attempt to cheat or defraud such other person;

   (B) willfully to make . . . any false report or statement . . . ;

   (C) willfully to deceive or attempt to deceive such other person . . . ; or

   (D) to bucket such order . . . .

   7 U.S.C. § 6b.

477 F.2d 113 (5th Cir. 1973). *See also Johnson, Applying* Hochfelder *in Commodity Fraud Cases,* 20 B.C.L.Rev. 633 (1979). *Cf. Nathan and Spindel, "I'm Guilty of What?" Emerging Concepts of Commodities Fraud,* 35 Bus.Law. 811, 814 (1980). Thus, one might argue that, just as the antifraud provision appearing in § 10(b) of the Securities Exchange Act[4] has been held to require scienter when the SEC enforces its Rule 10b–5,[5] *see Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the statutory antifraud provision here compels the CFTC to read a scienter requirement into its Rule 30.02. The CFTC would almost certainly have to read a scienter requirement into an antifraud rule governing *domestic* futures transactions, for these are precisely what the statute itself governs. See discussion pp. 5–6, *infra.* And, since antifraud regulation of *foreign* futures transactions is quite similar to regulation of domestic transactions, one might conclude that a similar limitation on the Commission's authority to promulgate a foreign futures antifraud rule should be implied.

Second, one might bolster the first argument by pointing out that the very power of the CFTC to regulate transactions in foreign futures contracts must be derived from the statute by implication rather than by way of express statement. Section 4b of the Act, 7 U.S.C. § 6b, which expressly prohibits fraud, deceit and willful misstatements, is limited to transactions "subject to the rules of [a] contract market." 7 U.S.C. § 6b. Other provisions of the Act suggest that a "contract market" must be a market within the United States. *See* 7 U.S.C. § 6 (prohibiting futures trading on boards of trade "in the United States" not designated as "contract market[s]" by the CFTC).[6] The CFTC's power to apply an antifraud rule to *foreign* futures transactions therefore must be derived from the highly general grant of jurisdiction conferred on the CFTC by the 1974 amendments to the Commodity Exchange Act. Those amendments gave the CFTC "exclusive jurisdiction" with respect to transactions involving futures contracts "traded . . . on a contract market . . . *or [on] any other board of trade, exchange or market. . . .*" 7 U.S.C. § 2 (emphasis added). The legislative history suggests the applicability of this language to "futures contracts purchased and sold in the United States and executed on a foreign board of trade, exchange or market." 120 Cong.Rec. 34997 (1974) (statement of Senator Talmadge); *see also* 120 Cong.Rec. 34736 (1974) (statement of Congressman Poage). In addition, § 8a(5) of the Act authorizes the CFTC to

> make and promulgate such rules and regulations as, in the judgment of the Commission, are reasonably necessary to effectuate any of the provisions or to accomplish any of the purposes of

---

**4.** Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary." 15 U.S.C. § 78j(b) (1976).

**5.** Rule 10b–5 makes it unlawful in connection with the sale or purchase of any security

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
>
> 17 C.F.R. § 240.10b–5 (1981).

**6.** In fact, the CFTC has the power to designate "any board of trade" as a "contract market." 7 U.S.C. § 7. But, the purpose of this designation is to bring trading in futures contracts under CFTC supervision by making unlawful any trade on any board not designated as a "contract market." 7 U.S.C. § 6. Since Congress did not intend to prohibit futures trading in London, or elsewhere outside the United States, 7 U.S.C. § 6, it is reasonable to assume, as has the CFTC, that the Commission's power to designate a board of trade as a "contract market" is limited to domestic boards of trade. *See* 40 Fed.Reg. 18187 (April 25, 1975).

the Act. 7 U.S.C. § 12a(5). Given the need to rely on highly general language, legislative history and general rulemaking powers to find *any* regulatory power, one might conclude that Congress did not intend to give the CFTC significantly *broader* foreign than domestic antifraud authority. Thus, even if the CFTC has the power to regulate transactions in foreign futures contracts, *see Nathan and Spindel, supra* at 813; *but see Palmer Trading Co., Inc. v. Shearson Hayden Stone, Inc.*, [1977–1980 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,900 (N.D.Ill. April 20, 1979), one might conclude that it lacks the power to take so significant a step as to eliminate the *scienter* requirement altogether.

Finally, one can argue that certain purposes underlie the statute's "willfulness" limitation in the domestic context—namely, a desire to limit "malpractice insurance" costs, to avoid imposing too onerous a requirement upon the investment profession, to provide "fair" treatment for investment professionals. These same purposes arguably warrant a similar limitation in the foreign context, and suggest that it should be implied from the statute in the absence of some indication of congressional intent to the contrary.

On the other hand, there are strong arguments in support of the CFTC's position that no "scienter" is required. First, as just indicated, the language authorizing this foreign regulation does *not* contain any scienter limitation. *See* 7 U.S.C. §§ 2 and 12a(5). Why then imply a limitation found only in a different, nonapplicable section of the statute? Second, there are special risks involved in foreign futures transactions associated with the fact that the CFTC does not have power to regulate foreign futures exchanges directly. Third, the Act contains an antifraud provision that does *not* depend on scienter. *See* 7 U.S.C. § 6o. Although it only applies to "trading advisers" and "pool operators," that provision outlaws conduct that merely "operates" as a fraud, and thus suggests that scienter is not the *sine qua non* of all statutory liability for "fraud." Finally, perhaps the proper analogy is not with the statute's domestic anti-

fraud provision but with the CFTC's other antifraud rules applicable to *options* contracts and gold and silver *leverage* contracts. The CFTC has promulgated antifraud rules applicable to transactions in both types of contracts with prohibitions essentially identical to those in Rule 30.02. *See* 17 C.F.R. §§ 32.9 (options contracts) and 30.03 (leverage contracts) (1981). And, as to both of these rules, there are cases suggesting that liability does not depend on scienter. *See CFTC v. U. S. Metals Depository Co.*, 468 F.Supp. 1149 (S.D.N.Y.1976); *CFTC v. J. S. Love & Associates Options, Ltd.*, 422 F.Supp. 652 (S.D.N.Y.1976); *CFTC v. Premex, Inc.*, 655 F.2d 779 (7th Cir. 1981). *But see also* 7 U.S.C. §§ 6c(b) and 23(b) (suggesting that the CFTC's rulemaking powers as to *option* and *leverage* contracts are particularly broad).

As these arguments indicate, the CFTC's attempt to dispense with the scienter requirement raises difficult, fundamental questions concerning the proper meaning and interpretation of the Commodity Exchange Act. We do not believe this court should pass upon the scienter issue unnecessarily—that is, in the absence of a determination by the CFTC to impose liability without scienter in a case lacking any less controversial basis for finding liability. Such a case would both demonstrate that the issue is ripe for judicial review, *see generally Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and provide this court with the benefit of an agency analysis of how a "non-scienter" rule would apply in the context of facts that require it. Despite the CFTC's apparent desire to have us decide these questions here, this is not such a case.

**B**

■ In this case it is sufficient to hold that the Commission need not find an actual *intent* to misrepresent a fact or to deceive. Rather, it can base liability upon *recklessness*—which has been defined as a "lesser form of intent." *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 793 (7th Cir. 1977). A "reckless" misrepresentation

is one that departs so far from the standards of ordinary care that it is very difficult to believe the speaker was not aware of what he was doing. Indeed, Prosser suggests that to act "recklessly" is to act "in disregard of a risk so obvious" that the actor "must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *W. Prosser, Law of Torts* 185 (4th ed. 1971). *Cf. Sundstrand Corp. v. Sun Chemicals Corp.*, 553 F.2d 1033, 1045 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).

That the Commission has the power to base liability upon "willful" behavior, liberally defined to include "reckless" behavior, is suggested by the extensive body of case law dealing with the scienter requirement under SEC Rule 10b–5 and § 10(b) of the Securities Exchange Act of 1934. The leading Supreme Court case, *Ernst & Ernst v. Hochfelder, supra*, states that the scienter required by § 10(b) means "a mental state embracing intent to deceive, manipulate or defraud." *Id.*, 425 U.S. at 193, 96 S.Ct. at 1381. Holding that mere negligence was not enough to meet this standard, the Court expressly left open the question of "whether, in some circumstances, reckless behavior is sufficient for liability. . . ." *Id.* at 194 n.12, 96 S.Ct. at 1381 n.12. Since *Hochfelder* was decided in 1976, virtually every federal appellate court to have confronted this open question has answered it affirmatively. *See, e.g., IIT, An International Investment Trust v. Cornfeld*, 619 F.2d 909, 923 (2d Cir. 1980); *United States v. Chiarella*, 588 F.2d 1358, 1370–71 (2d Cir. 1978), *rev'd on other grounds*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1979); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979); *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir.), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); *Sanders v. John Nuveen & Co., supra. Cf. Hoffman v. Estabrook & Co., Inc.*, 587 F.2d 509, 516 (1st Cir. 1978) (assumed but not decided that "recklessness" suffi-

cient); *Cook v. Avien, Inc.*, 573 F.2d 685, 692 (1st Cir. 1978) (same).

We are aware that courts in two cases have apparently read the scienter requirement in the Commodity Act's antifraud provision quite strictly. *See Economou v. Department of Agriculture, supra; McCurnin v. Kohlmeyer & Co., supra.* Both of these cases, however, were decided before the "recklessness" rulings in the 10b–5 area, and, in any event, neither suggests that the "willful" requirement of the Commodity Act's antifraud provision cannot be read to include "reckless." In fact, Prosser suggests the two terms are often used interchangeably. *W. Prosser, supra* at 185.

Even if the securities cases were not sufficiently in point, however, and even if *Economou* and *McCurnin* were meant to be read more narrowly, we should reach the same conclusion. The arguments advanced by the CFTC, and discussed in Part II.A above, convince us that the Act authorizes the Commission to predicate liability for fraud in foreign futures transactions on a reckless state of mind. The absence of any scienter language in the chain of statutory provisions on which the CFTC relies, the possible differences in foreign futures transactions implying a strong need for protection, and the latitude typically given to an agency to interpret its authorizing statute at least as to narrow questions of law, *see, e.g., Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1979); *Constance v. Secretary of Health & Human Services*, 672 F.2d 990, 996 (1st Cir. 1982), convince us that the CFTC can go at least this far.

C

■ Once Ruddy's testimony is believed (and the Commission credited that testimony), a finding of reckless behavior by Badoian, and hence FCCB, becomes inevitable. Ruddy wanted to know if the "hedge" would hurt his "up" position; Badoian knew this was a matter of importance to Ruddy; Badoian assured Ruddy that the "hedge" would not hurt his "up" position;

but this assurance was totally false. The "hedge" did not simply "hurt" Ruddy's "up" position; it destroyed it, eradicated it, wiped it out. While Ruddy held the "hedge," he simply had no "up" position. And, the reasons this is so appear to be so directly bound up in the nature of what "call options" and "short futures contracts" are, that it is nearly inconceivable that a commodities broker would not know that the impression he gave was false. The best that can be said for Badoian is that he may have thought Ruddy would not be hurt because he (Badoian) intended to sell or dispose of the "hedge" if the price began to go up (which, in fact, he did not do). But, that is no answer, for it would have been obvious, even to Ruddy, that a "hedge" could not offset the effects of any *further* upward price movements once the "hedge" was no longer there. Clearly, Ruddy wanted to know about the effects of the "hedge" while he held the "hedge," not when it was gone. And, as to this the impression that Badoian gave was diametrically opposed to the truth, in a manner that certainly ought to have been obvious to him, but not necessarily obvious to Ruddy. Hence, Badoian behaved recklessly, at best.

The Commission found that Badoian's conduct was "willful." In characterizing his statements as "gross mischaracterizations" and "grievous," and in finding the facts discussed above, it was, in effect, if not in haec verba, determining that Badoian's conduct constituted reckless behavior. The single disturbing element of the Commission's opinion is that it also characterized this conduct as being in "careless disregard" of the truth. We are aware that this phrase has been associated with "willful" or "intentional" behavior. *See United States v. Illinois Central R. Co.*, 303 U.S. 239, 242–43, 58 S.Ct. 533, 534–35, 82 L.Ed. 773 (1938); *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933); *Silverman v. CFTC*, 549 F.2d 28, 31 (7th Cir. 1977). *Cf. Goodman v. Benson*, 286 F.2d 896, 900 (7th Cir. 1961); *Eastern Produce Co. v. Benson*, 278 F.2d 606, 609 (3d Cir. 1960). *But see CFTC v. Savage, supra.*[7] The Commission probably intended it as an equivalent of "recklessness." But, we think its use in this context is unfortunate. The word "careless" normally suggests negligence. *See Nathan and Spindel, supra* at 817–18. At best, its use here unnecessarily proliferates states of mind. "Recklessness" itself is a state of mind between "intentional" and "negligent;" to use a term which could suggest other "inbetween" states or degrees of "inbetweeness" is confusing. Nonetheless, the Commission did not mean

---

7. The association of the phrase "careless disregard" with the concept of willfulness apparently derives from *United States v. Murdock*, 290 U.S. at 394–95, 54 S.Ct. at 225, which draws the connection out of three earlier cases. The first, *United States v. Philadelphia & R. Ry. Co.*, 223 F. 207 (E.D.Pa.1915), which directed a judgment in favor of a defendant charged with "willfully" confining hogs to a railroad car for more than 36 consecutive hours, characterized "willfulness" as "an intentional ignoring of the law, or of *indifference* to its provisions." *Id.* at 210 (emphasis added). The second, *State v. Savre*, 129 Iowa 122, 105 N.W. 387 (Iowa 1905), held that one could be convicted of "willfully" voting where unqualified only if one voted there with "knowledge of [one's] disqualification or [with] a *reckless disregard* of whether disqualified or not." 105 N.W. at 391 (emphasis added). The third, *State v. Morgan*, 136 N.C. 628, 48 S.E. 670 (N.C.1904), referred to yet *a fourth case where it was held that one could be convicted of "willfully" damaging the house of another only if one did so "purposely and deliberately, ... without authority, careless*

whether [one] has the right or not ...." 48 S.E. at 671 (quoting *State v. Howell*, 107 N.C. 835, 12 S.E. 569) (emphasis added).

The later cases cited in the text, for the most part, refer to "careless disregard" of a statute that makes clear defendant does not have the right he claims. The notion that one can act intentionally or recklessly with a somewhat lesser state of mind as to a portion of what one ought to know survives in, for example, *Restatement of Torts* § 500, which provides:

*Reckless Disregard of Safety Defined*

The actor's conduct is in reckless disregard of the safety of another if he does an act ... *having reason* to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent. (Emphasis added.)

In any event, the use of the phrase "careless disregard" sheds little light in contexts of the sort present here.

by its use of that phrase that Badoian was just negligent. The language of its opinion does not suggest so, and the facts in the record easily support, if they do not compel, the stronger "recklessness" conclusion.

Because we believe that defendants were reckless (*i.e.*, that they were found to be reckless and that the record more than supports that finding), and because we believe the Commission has adequate power to predicate liability upon that state of mind, we affirm its decision.

*Affirmed.*